1
Martin D. Gross, SBN147426
LAW OFFICES OF MARTIN D. GROSS
2
2001 Wilshire Blvd. Suite 205
Santa Monica, CA 90403
3
p. (310) 453-8320

4
Attorneys for Debtor in Possession
5
CENTER COURT PARTNERS, LLC

6

7

8
# UNITED STATES BANKRUPTCY COURT
9
## CENTRAL DISTRICT OF CALIFORNIA
### SAN FERNANDO DIVISION
10

| | |
|---|---|
| 11  In re: | Bk. No.1:11 -13715-MT |
| 12  CENTER COURT PARTNERS, LLC | In a Case Under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101 et seq.) |
| 13             Debtor in Possession | |
| 14 | **(1)** ORIGINAL DISCLOSURE STATEMENT DESCRIBING **(2)** ORIGINAL CHAPTER 11 PLAN |
| 15 | Disclosure Statement Hearing |
| 16 | |
| 17 | Date:<br>Time:<br>Ctrm: |
| 18 | |
| 19 | |
| 20 | |
| 21 | Plan Confirmation Hearing<br>Complete This Section When Applicable |
| 22 | Date: |
| 23 | Time:<br>Ctrm: |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

CCP.032511

# TABLE OF CONTENTS

**I. INTRODUCTION** ........................................................................................................... 1

    A.    Purpose of This Document ............................................................................. 2

    B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ...................... 2

        1.    Time and Place of the Confirmation Hearing ................................................. 3

        2.    Deadline for Voting For or Against the Plan ................................................. 3

        3.    Deadline for Objecting to the Confirmation of the Plan ................................... 3

        4.    Identity of Person to Contact for More Information Regarding the Plan ............... 3

    C.    Disclaimer ................................................................................................... 3

**II. BACKGROUND** ............................................................................................................ 4

    A.    Description and History of the Debtor's Business ..................................................... 4

    B.    Principals/Affiliates of the Debtor's Business ........................................................... 4

    C.    Management of the Debtor Before and After the Bankruptcy ...................................... 4

    D.    Events Leading to Chapter 11 Filing ..................................................................... 5

    E.    Significant Events ............................................................................................... 5

        1.    Bankruptcy Proceedings ............................................................................ 7

        2.    Other Legal Proceedings ........................................................................... 8

        3.    Actual and Projected Recovery of Preferential or Fraudulent Transfers ............. 9

        4.    Procedures Implemented to Resolve Financial Problems ................................. 9

        5.    Current and Historical Financial Conditions ................................................ 10

**III. SUMMARY OF THE PLAN OF REORGANIZATION** ...................................................... 11

    A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan ............... 11

    B.    Unclassified Claims ......................................................................................... 11

        1.    Administrative Expenses .......................................................................... 12

        2.    Priority Tax Claims .................................................................................. 13

    C.    Classified Claims and Interests ........................................................................... 13

        1.    Classes of Secured Claims ....................................................................... 14

2.  Classes of Priority Unsecured Claims ....................................................................... 15

3.  Classes of General Unsecured Claims ..................................................................... 15

4.  Class(es) of Interest Holders ..................................................................................... 16

D.  Means of Effectuating the Plan ....................................................................................... 17

1.  Funding for the Plan ................................................................................................... 17

2.  Post-Confirmation Management ............................................................................... 18

3.  Disbursing Agent ........................................................................................................ 19

E.  Risk Factors ........................................................................................................................ 19

F.  Other Provisions of the Plan ........................................................................................... 20

1.  Executory Contracts and Unexpired Leases .......................................................... 20

a. Assumptions.............................................................................................................20

b. Rejections.................................................................................................................10

2.  Changes in Rates Subject to Regulatory Approval ............................................... 21

3.  Retention of Jurisdiction ........................................................................................... 21

G.  Tax Consequences of Plan .............................................................................................. 22

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES                                    22

A.  Who May Vote or Object.................................................................................................... 22

1.  Who May Object to Confirmation of the Plan ........................................................ 22

2.  Who May Vote to Accept/Reject the Plan............................................................... 22

a. What is an Allowed Claim/Interest......................................................................... 22

b. What is an Impaired Claim/Interest ....................................................................... 23

3.  Who is Not Entitled to Vote........................................................................................ 23

4.  Who Can Vote in More Than One Class .................................................................. 24

5.  Votes Necessary to Confirm the Plan...................................................................... 24

6.  Votes Necessary for a Class to Accept the Plan................................................... 24

7.  Treatment of Nonaccepting Classes ....................................................................... 24

8.  Request for Confirmation Despite Nonacceptance by Impaired Class(es) ................ 25

B.  Liquidation Analysis ........................................................................................................... 25

C.   Feasibility ................................................................................................................. 29

**V. EFFECTS OF CONFIRMATION OF PLAN**                                                    **31**

A.   Discharge ................................................................................................................. 31

B.   Revesting of Property in the Debtor ........................................................................ 31

C.   Modification of Plan ................................................................................................. 31

D.   Post-Confirmation Status Report ............................................................................ 32

E.   Quarterly Fees ......................................................................................................... 32

F.   Post-Confirmation Conversion/Dismissal ............................................................... 32

G.   Final Decree ............................................................................................................ 33

**VI. SUPPORTING DECLARATIONS**                                                           **34**

EXHIBIT A – LIST OF ALL ASSETS ................................................................................ 35

EXHIBIT B – FINANCIAL STATEMENT ........................................................................... 22

EXHIBIT C – UNEXPIRED LEASES TO BE ASSUMED.................................................... 37

EXHIBIT D – EXECUTORY CONTRACTS TO BE ASSUMED.......................................... 38

EXHIBIT E – LIQUIDATION ANALYSIS ........................................................................... 39

EXHIBIT F – LIST OF ADMINISTRATIVE EXPENSE CLAIMS ....................................... 40

EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS ............................................... 41

EXHIBIT H – LIST OF GENERAL UNSECURED CLAIMS ............................................... 47

EXHIBIT I – LIST OF EQUITY INTERESTS..................................................................... 48

# I.

## INTRODUCTION

CENTER COURT PARTNERS, LLC, a California Limited Liability company (hereinafter "CENTERCOURT") is the Debtor in a Chapter 11 bankruptcy case. On March 25, 2011, CENTERCOURT commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. §101 et seq., Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. CENTERCOURT is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

CENTERCOURT is the Debtor in a Chapter 11 bankruptcy case. On March 25, 2011, CENTERCOURT commenced a bankruptcy case by filing voluntary Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 et seq. This document is the Chapter 11 Plan ("Plan") proposed by CENTERCOURT ("Plan Proponent"). Sent to you in the same envelope as this document is the Disclosure Statement which has been approved by the Court, and which is provided to help you understand the Plan.

This is a reorganization plan. In other words, the Proponent seeks to accomplish payments under the Plan by obtaining funds through outside financing that shall be approved by the Court and creditors. There will be one lending facility, currently proposed by Preferred Bank to lend twelve million dollars ($12,000,000.00) accompanied by a two-million, one hundred thousand ($2,100,000) cash infusion from City Lights Financial Express, Inc. (hereinafter "CITYLIGHTS") for an aggregate amount of fourteen million, one hundred thousand dollars ($14,100,000.00) to fund the Plan. The Effective Date of the proposed Plan shall be (i) sixty (60) days following Confirmation, and (ii) if an appeal from the Confirmation Order is timely filed, the first business day upon which implementation of the Plan has not been stayed pending such appeal.

**A.      Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

**(1)    WHO CAN VOTE OR OBJECT,**

**(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

**(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

**(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6)    WHETHER THIS PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.

CCP.032511                                    2

HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON

THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1. Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on

_____at _____{A.M./P.M.}, in Courtroom _____, of the United States

Bankruptcy Court, Central District of California, San Fernando Division, 21041 Burbank Blvd, Woodland

Hills, CA 91367.

**2. Deadline for Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot

in the enclosed envelope to:

LAW OFFICES OF MARTIN D. GROSS, Martin D. Gross
2001 Wilshire Blvd. Suite 205, Santa Monica, CA 90403, p. (310) 453-8320.

Your ballot must be received by _____ or it will not be counted.

**3. Deadline for Objecting to the Confirmation of the Plan**

Objections to the confirmation of the Plan must be filed with the Court and served upon
LAW OFFICES OF MARTIN D. GROSS, Martin D. Gross
2001 Wilshire Blvd. Suite 205, Santa Monica, CA 90403, p. (310) 453-8320.

by _____.

**4. Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact:

LAW OFFICES OF MARTIN D. GROSS, Martin D. Gross
2001 Wilshire Blvd. Suite 205, Santa Monica, CA 90403, p. (310) 453-8320.

**C.    Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtor's current financials,

existing leases, proposed value of the property with the anchor tenant in place, the cost to improve the

property and tenant improvements, the appraisal of the property with projected value after completion,

financial commitments of lenders and investors, and the economic condition of the marketplace. The

information contained in this Disclosure Statement is provided by Roger W. Meyer, (hereinafter "MEYER")

Managing Member of CENTERCOURT.  The Plan Proponent represents that everything stated in the

CCP.032511                                3

Disclosure Statement is true to the Proponent's best knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

## II.

## BACKGROUND

A.    **Description and History of the Debtor's Business**

The Debtor, CENTERCOURT, is a California Limited Liability company.

The debtor is in the business of:

a)  Developing the property located at 29501 Canwood Street, Agoura Hills, CA 91301;
b)  The project is subdivided into twenty-two (22) medical office condominiums for lease or sale;
c)  Two (2) suites have been leased and improved; eleven suites comprising 23,550 square feet of the existing first floor have been committed to the anchor tenant, an addition to the first floor of 11,400 square feet to be improved, and approximately 7,200 square feet of the existing subterranean level to be improved, totaling 42,150 rentable square feet.
d)  The remainder of the second floor is available for sale or lease, approximately 80% of final completion, commonly known in the industry as "warm shell" condition which means that all of the structural and demising walls are in place and the suites are ready for floor plan design and tenant improvements.

The debtor has been in this business since March 24, 2005.

B.    **Principals/Affiliates of Debtor's Business**

a) Roger W. Meyer, Managing Member, 91.5% ownership interest

b) Karen Meyer, Member, 8.5% Ownership Interest.

C.    **Management of the Debtor Before and After the Bankruptcy**

a) Roger W. Meyer, Managing Member before the Bankruptcy

b) The Plan contemplates the sale of 50% of CenterCourt Partners, LLC to an investor, City Lights Financial Express, Inc. (hereinafter "CITYLIGHTS"), whereas MEYER and CITYLIGHTS would be 50/50 Managing Members and Owners of CenterCourt Partners, LLC during the remainder of these Bankruptcy proceedings after confirmation of the Plan. Upon confirmation of the Plan, or as soon as practicable, CENTERCOURT will amend the organization to reflect the ownership percentage

CCP.032511                                    4

change and capital contributions/reductions per the Plan.  Roger W. Meyer and Karen Meyer have

pre-approved the fifty percent (50%) ownership transfer to CITYLIGHTS.

c) CITYLIGHTS and MEYER as 50/50 Managing Members of CENTERCOURT after the

Bankruptcy.

**D.    Events Leading to Chapter 11 Filing**

Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case:

The case involves that certain real property located in Agoura Hills, California, situated in Los

Angeles County, which is a newly constructed medical office building consisting of twenty-two (22) medical

condominiums, with separate Assessor's Parcel Numbers:  2053-001-029, 2053-001-030, 2053-001-031,

2053-001-032, 2053-001-033, 2053-001-034, 2053-001-035, 2053-001-036, 2053-001-037, 2053-001-038,

2053-001-039, 2053-001-040, 2053-001-041, 2053-001-042, 2053-001-043, 2053-001-044, 2053-001-045,

2053-001-046, 2053-001-047, 2053-001-048, 2053-001-049 and 2053-001-050, whose addresses

comprise the building commonly known as Center Court Plaza, located at 29501 Canwood Street, Agoura

Hills, California, 91301

The legal description of the property is:

Lot 1 of Tract No. 062211, in the City of Agoura Hills, County of Los Angeles, State of California, as
per Map filed in Book 1338, Pages 49 and 50 of Maps, in the Office of the County Recorder of said
County. The twenty-two APN's are indicated on page 2 of the Plat Map associated with the
aforementioned address which defines the condominium plan.

On or about August 7, 2007 CENTERCOURT entered into a written contract, a Promissory Note,

with Montecito Bank & Trust (hereinafter "MONTECITO") for a construction loan in the amount of ten million

dollars ($10,000,000), to develop and build Center Court Plaza.   The construction on the building was

complete in November 2008.  The units have been offered for sale since June 2008.  Due to the conditions

of the marketplace, the marketing strategy for the building was revised in the fourth quarter of 2009 to

include lease or lease options to purchase of the suites.  Two (2) lease tenants were secured and have

occupied space in the building since March 2010.

May 4, 2010, CENTERCOURT and MONTECITO entered into a written forbearance agreement

contract to extend and forbear the terms of the original construction loan, with a forbearance period

1   extended to July 15, 2010. A First Amendment to Forbearance was subsequently executed to extend the

2   forbearance period to September 27, 2010. Throughout the entire forbearance period, CENTERCOURT

3   was in negotiations with a multitude of prospective tenants and buyers, including approximately nine

4   months of negotiations with Providence Medical Group Tarzana, where Providence required that any

5   prospective tenants were to be approved by them prior to executing any leases and incorporated into a

6   master lease that they were to execute for 100% of the building. Those negotiations proved unfruitful and

7   were terminated approximately June 2010.

8           Immediately thereafter, negotiations were entered into with Mariner Health Care, Inc. ("Mariner") for

9   100% of the building. The Mariner negotiations were noted in the forbearance agreement with

10  MONTECITO as CENTERCOURT maintained open disclosure with MONTECITO regarding the progress of

11  any prospective buyers or tenants. These negotiations proved fruitful, leasing Mariner 100% of the building

12  at a market favorable rate of one-hundred forty-one thousand, five hundred dollars ($141,500.00) per

13  month, triple-net, which sums one-million, six hundred ninety-eight thousand dollars ($1,698,000.00)

14  annually, with 2.75% escalations, for a term of 20 years, with two 10 year options to extend, summing 40

15  years. Subsequently, that lease has been amended and the proposed tenant improvements have been

16  adjusted to meet the Office of Statewide Health Planning and Development ("OSHPD") requirements,

17  whereas Mariner will occupy the entire first floor, an additional 11,400 square feet of improvement and

18  approximately 7,500 square feet of the subterranean level to operate as a skilled nursing facility.

19          September 29, 2010 MONTECITO filed a Notice of Default on the Construction Deed of Trust in the

20  Los Angeles County Recorder's office.

21          October 28, 2010 MONTECITO filed suit in Santa Barbara Superior Court to enforce the Personal

22  Continuing Guarantee of MEYER, for CENTERCOURT, SBSC Case No. 1372409. A prejudgment writ of

23  attachment has been ordered in the amount of five hundred thousand dollars ($500,000). MONTECITO

24  has captured three-hundred twenty-four thousand dollars ($324,000) from MEYER's personal wealth

25  management account in that matter. The case has been removed to this Court.

26          Negotiations between CENTERCOURT and MONTECITO continued throughout the default period,

27  CENTERCOURT seeking a remedy for the default, which included an offer by CENTERCOURT, with the

28  consent and approval of CITYLIGHTS as a lending facility and/or investor, to pay off the outstanding lien for

CCP.032511                                    6

eight million five hundred thousand dollars ($8,500,000.00) all cash. That offer was made to MONTECITO on December 22, 2010 and promptly rejected by MONTECITO.

January 13, 2011, CENTERCOURT filed suit against MONTECITO in Los Angeles Superior Court against MONTECITO, LASC case no. LS021121-CW-LC092694. CENTERCOURT's claims allege breach of the contract whereas MONTECITO has overcharged CENTERCOURT at an excessive default rate, wrongfully foreclosing on a fatally defective notice amongst other things. No trial date has been set for this case. The case is one of two adversarial cases removed to this Court.

MEYER has spent a substantial amount of his own personal funds to keep CENTERCOURT afloat. He has lent four million, six hundred thousand dollars ($4,600,000.00) of his personal money to the business and has continually paid all of the expenses of the business in order to allow the building the necessary means to survive, including paying approximately one-million, six hundred thousand dollars ($1,600,000) in interest on the loan to CENTERCOURT out of MEYER's personal funds.

**E.    Significant Events During the Bankruptcy**

**1.    Bankruptcy Proceedings**

The following is a chronological list of significant events which have occurred <u>during</u> this case:

On March 25, 2011, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and is presently operating as a debtor-in-possession.

On April 7, 2011 Substitution of Attorney filed to replace Rocky Ortega with Martin Gross.

On April 27, 2011, the Meeting of Creditors took place at the office of the United States Trustee.

On May 16, 2011 Monthly Operating Report for April 2011 was filed.

On May 23, 2011 Notice of Removal filed for Los Angeles Superior Court case no. LS021121-cw-LC092694. Status conference scheduled for July 27, 2011.

On May 23, 2011 Notice of Removal filed for Santa Barbara Superior Court case no.1372409. Status conference scheduled for July 27, 2011.

On 06/02/11 Order approving employment of the Law Office of Martin D. Gross.

On 06/02/11 Motion to Set Insider Compensation: JRM Equities.

On 06/09/11 Motion for Use of Cash Collateral filed.

On 06/13/11, Monthly Operating Report for May 2011 filed.

1  The Court has approved the employment of the following professionals: Law Offices of Martin D.

2  Gross, Attorney Martin D. Gross.

3

4  **Currently, the following significant adversary proceedings and motions are still pending:**

5  Motion to Set Insider Compensation, Hearing date: June 23, 2011.  JRM Equities is a Property

6  Management company that is owned by the son of the Debtor's Managing Member, Roger

7  Meyer.  He has been involved in management of the building consistently since its opening.  In

8  February of 2011 Debtor fired the landscaping company and JRM Equities took over the

9  landscaping responsibilities at a reduced rate from the previous company.

10  **1:11-ap-01384-MT Center Court Partners LLC et al v. Montecito Bank & Trust;**

11  Status Conference set for July 27, 2011; Center Court alleges that MONTECITO is in Breach of

12  Contract, is wrongfully foreclosing, loan documents including the Notice of Default has fatal

13  defects, and has been overcharging Default Interest since May 2010.  The controversy is over

14  the correct default interest rate being levied against CENTERCOURT. CENTERCOURT

15  alleges that MONTECITO has overcharged CENTERCOURT in excess of one hundred

16  seventy-two thousand dollars ($172,000) since May 25, 2010. **Rocky V. Ortega**, attorney for

17  plaintiff in this action, has had the loan documents professionally audited and found fatal

18  defects in the loan agreements and in the Notice of Default.  Full case files were submitted to

19  the Court with the Notice to Remove.  The outcome of the Los Angeles Action is an asset to the

20  Debtor, or Plan Proponent, and should be treated as such.

21  **1:11-ap-01385-MT Montecito Bank & Trust v. Meyer;**

22  Status Conference set for July 27, 2011; the funds, in the amount of three hundred twenty-four

23  thousand dollars ($324,000), that Montecito have relinquished from Meyer's personal account

24  via a Pre-judgment Writ of Attachment in Santa Barbara Superior Court are included in the Plan

25  as being released to Montecito to resolve that case upon confirmation of the Plan.  Full case

26  files were submitted to the Court with the Notice to Remove.

27

28  **2.  Other Legal Proceedings**

1    In addition to the proceedings discussed above, the Debtor is currently involved in the following

2  non-bankruptcy legal proceedings: Notice to Remove for LASC LS021121 and SBSC 01372409 has been

3  filed. Status conference is currently set for July 27, 2011.

4    3. **Actual and Projected Recovery of Preferential or Fraudulent Transfers**

5        None exists and none are expected to be filed.

6    4. **Procedures Implemented to Resolve Financial Problems**

7    To attempt to fix the problems that led to the bankruptcy filing, Debtor has implemented the

8  following procedures:

9    The Debtor's business the sale, lease and management of the the building located at 29501

10  Canwood Street, Agoura Hills, CA. It has been the Debtor's primary goal to sell or lease the 22 medical

11  condominiums. Two have been leased and improved and during lengthy negotiations with Mariner Health

12  Care, Mariner has executed a lease of the entire first floor, a 11,400 square foot addition, and

13  approximately 7,500 square feet of the subterranean level for use as a skilled nursing facility. A skilled

14  nursing facility's primary functions are post surgical short and long term care, intravenous therapy, pain

15  management, enteral therapy and psychological services. The facility needs to meet the requirements of

16  OSHPD standards for overnight patient residents. Skilled Nursing Facilities differ from Assisted Living as

17  they provide more acute care. The City of Agoura Hills has stated in preliminary meetings that the Agoura

18  Hills area is underserved for skilled nursing facilities. The CENTERCOURT building is situated directly

19  between three major medical hospitals, Los Robles Regional Medical Hospital to the north and Tarzana

20  Hospital to the south are approximately twelve miles in either direction on the 101. West Hills Hospital is

21  approximately the same distance. Initially, Mariner had agreed to lease 100% of the building, but due to the

22  stringent regulations of OSHPD, the second floor could not be used for this purpose and alternate plans

23  had to be agreed upon.

24    Debtor's architects, Johnson and Muller, and Mariner's architects worked diligently on these plans

25  and produced a plan that both parties have agreed upon. Johnson and Muller were involved in the

26  building's initial design and construction and are integral to the improvement plans. They are the most

27  informed and knowledgeable architects for the project as they have detailed understanding of the building

28  which saves CENTERCOURT thousands of dollars in expense over hiring an outside firm for the same

CCP.032511                                9

purpose. Due to the Bankruptcy, the project has been stalled until such time that this Plan is approved or Debtor has authority to move forward with construction.

The proposed tenant improvements for the Mariner lease will cost approximately $5,901,000 to complete in a 12-15 month timeframe. The rental income that will be produced after commencement of the Lease is one hundred thousand dollars ($100,000.00) per month for the Mariner portion of the Building, ten thousand, four hundred sixty dollars ($10,460.00) from the two existing tenants, and approximately forty-nine thousand, one hundred fifty-seven dollars and fifty cents ($49,157.50) per month from the remaining available 18,550 of space available in the building if the additional space is leased. The tenant improvement plan provides, due to the fact that the entire first floor is leased and reconfigured for that purpose, both of the existing tenants of the building, Dr. Anita Pakula and LabWest, will be required to be relocated to the second floor of the building. There are currently suites available with exact footprints directly above

Debtor has been in negotiations with several investors and banks to fund the project. Debtor has commitments from Preferred Bank for a construction loan for twelve million dollars ($12,000,000.00) and two million one hundred thousand dollars ($2,100,000.00) in a cash infusion from CITYLIGHTS for an aggregate of fourteen million one hundred thousand dollars ($14,100,000.00). CITYLIGHTS will provide the cash necessary under the Plan in exchange for 50% ownership of CENTERCOURT. These funds are sufficient to complete the Plan, provided that each of the current creditors' claims are minimally reduced, including MEYER taking a 35% reduction in claim to allow the investor, CITYLIGHTS, sufficient equity in CENTERCOURT to execute the deal.

Debtor's existing leases are above market rental value. Debtor plans on offering the available second floor space at lease rates competitive to the adjacent complex and marketplace, average $2.65/square foot, modified gross. Some adjustments and accommodations will be made during lease negotiations to secure tenancy. Once the Plan is confirmed and the Mariner project underway, the building will command a higher than average interest as Agoura Hills is an underserved marketplace for skilled nursing and supportive medical offices.

**5. Current and Historical Financial Conditions**

Debtor's current financial situation is insufficient to maintain the building "as-is". Debtor collects $10,460.01 in rents monthly. The building has a current vacancy of 89%, with 20 suites available. However, Mariner has executed a lease for the entire first floor, including a 11,400 addition to the first floor and space in the subterranean level for use as a skilled nursing facility. The tenant improvements are expected to take twelve to fifteen months to complete.

Other than contracts with vendors for management, maintenance, utilities and other associated facility support companies, Debtor does not have any other liabilities.

Debtor is in default on the construction loan and, as per the Plan, intends on securing other sources of capital to relieve the debt obligation of the secured creditor, take on an investor partner to provide a cash infusion sufficient enough to complete the required tenant improvements to commence the Mariner lease.

Debtor uses simple cash accounting and bookkeeping as Debtor does not have any other assets, personnel, liabilities other than normal leases, contracts, facility maintenance and property taxes to account for.

Debtor has filed taxes timely since its inception.

The identity and fair market value of the estate's assets are listed in Exhibit A. See also the Debtor's financial history set forth in Exhibit B.

## III.

## SUMMARY OF THE PLAN OF REORGANIZATION

### A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

### B.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not placed the following claims in a class.

CCP.032511                                11

**1.  Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists all of the Debtor's § 507(a)(1) administrative claims and their treatment under the Plan. (see Exhibit F for detailed information about each administrative expense claim):

| Name | Amount Owed | Treatment |
|---|---|---|
| Martin D. Gross | $7,500.00 | Paid in Full on Effective Date or when practicable |
| Jack Humes | Unknown | Paid in Full on Effective Date or when practicable – after Employment Application Ordered Approved by the Court |
| Rocky V. Ortega | Unknown | Paid in Full on Effective Date or when practicable—after Employment Application Ordered Approved by the Court |
| Clerk's Office Fees | $0, all paid to date | Paid in Full on Effective Date, as fees accrue |
| Office of the U.S. Trustee Fees | $0, all paid to date | Paid in Full on Effective Date, as fees accrue |
|  | TOTAL |  |

<u>Court Approval of Fees Required:</u>

The Court must rule on all fees listed in this chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application.  Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

As indicated above, the Debtor will need to pay administrative claims on the Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim.  As indicated elsewhere in this Disclosure Statement, Debtor will have $14,100,000.00, plus DIP account balance (currently $24,532.85) amount of cash on hand on the Effective Date of the Plan.  The source of this cash will be consolidated funds based on the commitment of $12,000,000.00 from Preferred Bank for a construction loan and the infusion of $2,100,000.00 from City Lights Financial Express, Inc.

**2. Priority Tax Claims**

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax.

The following chart lists all of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan:

UNPAID PROPERTY TAX OBLIGATIONS

| Unit | Value | Total | 1st install | 2nd install | date due | Post Confirm Treatment |
|------|-------|-------|-------------|-------------|----------|------------------------|
| 2053-001-029 | $507,009.00 | $6,172.44 | $3,086.22 | $3,086.22 | 2/1/2011 | Pay in full on effective date |
| 2053-011-030 | $357,605.00 | $4,459.69 | $2,229.85 | $2,229.84 | 2/1/2011 | Pay in full on effective date |
| 2053-001-031 | $469,813.00 | $5,743.53 | $2,871.77 | $2,871.76 | 2/1/2011 | Pay in full on effective date |
| 2053-001-032 | $306,972.00 | $2,884.56 | $1,942.29 | $1,942.47 | 2/1/2011 | Pay in full on effective date |
| 2053-001-033 | $346,961.00 | $4,338.77 | $2,169.39 | $2,169.38 | 2/1/2011 | Pay in full on effective date |
| 2053-001-034 | $725,959.00 | $8,696.91 | $4,348.46 | $4,348.45 | 2/1/2011 | Pay in full on effective date |
| 2053-001-035 | $795,282.00 | $9,496.25 | $4,748.13 | $4,748.12 | 2/1/2011 | Pay in full on effective date |
| 2053-001-036 | $581,781.00 | $7,037.13 | $3,518.57 | $3,518.56 | 2/1/2011 | Pay in full on effective date |
| 2053-001-037 | $437,501.00 | $5,438.79 | $2,719.40 | $2,719.39 | 2/1/2011 | Pay in full on effective date |
| 2053-001-038 | $498,435.00 | $6,018.51 | $3,009.36 | $3,009.25 | 2/1/2011 | Pay in full on effective date |
| 2053-001-039 | $553,408.00 | $6,713.36 | $3,356.68 | $3,356.68 | 2/1/2011 | Pay in full on effective date |
| 2053-001-040 | $547,099.00 | $6,634.69 | $3,317.35 | $3,317.34 | 2/1/2011 | Pay in full on effective date |
| 2053-001-041 | $354,914.00 | $4,429.11 | $2,214.56 | $2,214.55 | 2/1/2011 | Pay in full on effective date |
| 2053-001-042 | $467,121.00 | $5,712.50 | $2,856.50 | $2,856.24 | 2/1/2011 | Pay in full on effective date |
| 2053-001-043 | $304,290.00 | $3,854.08 | $1,927.05 | $1,927.03 | 2/1/2011 | Pay in full on effective date |
| 2053-001-044 | $344,279.00 | $4,308.34 | $2,154.18 | $2,154.16 | 2/1/2011 | Pay in full on effective date |
| 2053-001-045 | $723,267.00 | $8,665.86 | $4,332.94 | $4,332.92 | 2/1/2011 | Pay in full on effective date |
| 2053-001-046 | $792,702.00 | $9,466.44 | $4,733.23 | $4,733.21 | 2/1/2011 | Pay in full on effective date |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2053-001-047 | $581,817.00 | $7,043.98 | $3,517.49 | $3,517.49 | 2/1/2011 | Pay in full on effective date |
| 2053-001-048 | $576,444.00 | $6,973.02 | $3,486.50 | $3,486.50 | 2/1/2011 | Pay in full on effective date |
| 2053-001-049 | $362,979.00 | $4,520.69 | $2,260.35 | $2,260.34 | 2/1/2011 | Pay in full on effective date |
| 2053-001-050 | $552,473.00 | $6,696.61 | $3,348.31 | $3,348.30 | 2/1/2011 | Pay in full on effective date |

total due:   $68,148.20

**C.    Classified Claims and Interests**

**1.   Classes of Secured Claims**

Secured claims are claims secured by liens on property of the estate. The following chart lists all classes containing Debtor's secured pre-petition claims and their treatment under this Plan:

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1. | Secured Claim of:<br><br>● Name = Montecito Bank and Trust<br><br>● Collateral description = Construction Deed of Trust<br><br>● Collateral value = $10,775,000.00 "as-is" $25,000,000 after completion of the tenant improvements for the Mariner Lease.<br><br>● Priority of security int. = 1st Position lien<br><br>● Principal owed = $9,000,000.00<br><br>● Pre-pet. arrearage amount = $257,031.20<br><br>● Post-pet. arrearage amount =$138,062.50<br><br>● Total claim amount = $9,395,093.75 | N | Impaired; claims in this class are entitled to vote on the Plan. | ● Pymt Interval      = lump<br>● Pymt amt/interval    =$7,891,851.50    =<br>● Begin date           =<br>Effective Date, or as soon as practicable thereafter<br>● Interest rate %     = N/A<br>● Total payout  87%    =$7,891,851.50 of principal claim $324,000 from Santa Barbara Action. = Aggregate payout of **$8,215,851.50**<br>● Treatment of Lien     = Restructure of Debt, 87% of Principal claim, less $324,000 recovered in Santa Barbara Action. |

**2.  Classes of Priority Unsecured Claims**

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), and (6), are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists all classes containing Debtor's 507(a)(3), (a)(4), (a)(5), and (a)(6), priority unsecured claims and their treatment under this Plan (see Exhibit G for more detailed information about each priority unsecured claim) Center Court Partners, LLC does not have any priority unsecured claims at this time.

**3.  Class of General Unsecured Claims**

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The following chart identifies this Plan's treatment of the class containing all of Debtor's general unsecured claims (see Exhibit H for detailed information about each general unsecured claim):

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 2 | Roger W Meyer $4,600,000.00 | Impaired; claims in this class are entitled to vote on the Plan. | Restructure of Claim to 65% of Claim = $3,000,000 No payout.  Retaining Restructure of ownership to 50% Ownership interest in Center Court Partners, LLC Interest Rate % N/A |
| 3 | Opal Meyer Survivor's Trust $1,400,000.00 | Impaired; claims in this class are entitled to vote on the Plan. | Restructure of Claim to 87% of Claim to $1,218,000.00 Payout Payout at Commencement of Mariner Lease per Plan Interest Rate % N/A |
| 4 | City Lights Financial Express, Inc. $148,000.00 | Impaired; claims in this class are entitled to vote on the Plan. | Restructure of Debt to 87% of claim to $128,760.00 Payout Payout at Commencement |

| | | | of Mariner Lease per Plan Interest Rate % per Note as approved |
|---|---|---|---|
| 5 | Johnson Muller Architects | Not impaired; claims in this class are not entitled to vote on the Plan, class has deemed to have accepted the plan. | No restructure of Debt $65,000.00 Payout Payout at plan effective date as continuing support is needed to move forward with the TI Construction |

### 4.   Class(es) of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both general and limited partners. If the Debtor is an individual, the Debtor is the interest holder. The following chart identifies the Plan's treatment of the Class of interest holders (see Exhibit I for more detailed information about each interest holder):

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 6 | Roger W. Meyer – 91.5% Ownership Center Court Partners, LLC | Impaired; All claims of the equity interest in Center Court Partners, LLC shall be reduced commensurate to the confirmation of the Plan in reference to Change of Ownership, City Lights Financial Express, Inc. as 50% Owner and 50% divisible by current ownership percentages. | Ownership % Reduction |
| 7 | Karen Meyer – 8.5% Ownership of Center Court Partners, LLC | Impaired; All claims of the equity interest in Center Court Partners, LLC shall be reduced commensurate to the confirmation of the Plan in reference to Change of Ownership, City Lights Financial Express, Inc. as 50% Owner and 50% divisible by current | Ownership % Reduction |

| | | ownership percentages. | |
|---|---|---|---|

**D.      Means of Effectuating the Plan**

**1.   Funding for the Plan**

The Plan is a reorganization plan and contemplates the continuation of the DIP's business, including the development of the tenant improvements (the "T.I.'s") property to accommodate the executory lease (the "Mariner Lease") by AH Healthcare Realty, LLC, whose parent company guarantor is Mariner Health Care, Inc. ( collectively "Mariner") The Plan contemplates generally that CityLights Financial Express, Inc. ("CITYLIGHTS"), as an investor, will acquire fifty (50%) percent of CenterCourt Partners, LLC and become a managing member and acquire fifty (50%) ownership of the company in exchange for the infusion of two million one hundred thousand dollars ($2,100,000.00) in additional cash. DIP contemplates the execution of the proposed twelve million dollars ($12,000,000.00) construction loan with one Lending Facility, currently Preferred Bank, together with the cash capital infusion of $2,100,000 from City Lights, an aggregate amount of fourteen million one hundred thousand dollars ($14,100,000.00) to fund the Plan. These funds combined will provide a proposed 60 day exit strategy for the only secured creditor, Montecito Bank and Trust ("Montecito") and sufficient funding for the TI's necessary to complete the Mariner Lease. These funds will further be appropriated to pay administration expenses, priority and tax payments, cure payments, real estate taxes and working capital.

The success of the Plan is largely dependent on the funding of the Plan.  The Plan contemplates the major creditors, secured and unsecured, taking a restructuring/reduction of their claims against the DIP, in order to meet the necessary results.  Firstly, Montecito would receive $7,891,851.50, 87% of their claim, in exchange for a full reconveyance of the Deed of Trust against the Property and satisfaction of the associated Loans.  Furthermore, MEYER would agree to the termination and release of the Continuing Guarantee of Roger Meyer in exchange for the $324,000.00 being held under the Prejudgment Writ of Attachment in the Santa Barbara Action, in which case it would be resolved or dismissed, resulting in aggregate total to Montecito of $8,215,851.50.   Montecito has received one million, four hundred sixty-seven thousand, eight hundred twenty-one dollars ($1,467,821) in interest, and two hundred fourteen, two hundred fifty dollars and forty-one cents ($214,250.41) in principal through September 27, 2010 on the Construction Loan.  The Plan of restructuring MONTECITO's claim by a reducing their claim and recovering the $324,000 from the Santa Barbara action, coupled with the

$1,467,821.00 in interest that has been collected to date, nets MONTECITO $683,672.50 over the life of the Loan.  Montecito will not have suffered a principal net loss.

Roger Meyer, Managing Member of Center Court Partners, LLC, would stipulate to a 35% reduction of his claimed $4,600,000.00, reducing his claim to $3,000,000 and retaining 50% ownership of Center Court Partners, LLC and foregoing any pay out to retain said ownership.  Under the Plan, the Opal Meyer Survivor's Trust's would take a 13% reduction of its unsecured claim of $1,400,000.00, rendering a balance of $1,218,000.00.  The Opal Meyer Survivor's Trust will take, upon confirmation of the plan, a note that shall be subordinate to the construction financing will be presented in place of payment, bringing the creditor's balance to par.  The Opal Meyer Survivor's Trust is the personal trust of Opal Meyer, MEYER's mother.  MEYER is the only living heir to the trust and the Trustee.  The Opal Meyer Survivor's Trust has been supportive of MEYER's venture in CENTERCOURT and has lent a substantial amount of money to CENTERCOURT for the purpose of maintaining the integrity of CENTERCOURT for its survival.

The Projected Net Revenue available will be mildly affected by market conditions, competition, cost of funds, cost of materials and labor, absorption rates, governmental regulations and other such risks as are customarily attendant to the real estate development business.  To the extent that any or all of these conditions and risks come into play, they will be minimized by the anchor Tenant's financial stability and ability to commence the lease as agreed for the first 20 years.  DIP foresees no adverse conditions that would affect or diminish the viability of the Plan, the Project and the likelihood of success provided the Tenant's needs are met.

The proposed budget for improvement to the property to satisfy the required Tenant Improvements for the Mariner Lease is projected at $5,901,000.00.

| | | |
|---|---|---|
| New funds | $14,100,000 | |
| Montecito | -$ 7,830,000 | |
| Architects | -$     65,000 | |
| TI's | -$ 5,901,000 | |
| Balance | $     304,000 | Remaining to pay administration fees, priority and tax payments, cure payments, real estate taxes and working capital. |

**2.  Post-Confirmation Management**

    1.  City Lights Financial Express, Inc., Mortgage Banker.

        (a)  Offices located at 29134 Roadside Drive, Ste #106, Agoura Hills, CA 91301,

            Managing Member of Center Court Partners, LLC, 50% Owner.

        (b)  To manage, oversee, and control all day-to-day operations of Center Court

            Partners, LLC, working with Roger W. Meyer on the project development.

(c) Post-petition compensation, None.

(d) City Lights Financial Express, Inc. has been in the retail and private mortgage and Lending business since 1995. Recently designated as a Mortgage Banker with a multitude of lending authorities, and lending facilities. City Lights Financial Express, Inc. is owner/operator of commercial and residential properties throughout California, Nevada and Arizona.

2.  Roger W. Meyer, Member, Center Court Partners, LLC

(a) Member

(b) To participate in day-to-day operation of Center Court Partners, LLC; Project developer of the property and will manage the Tenant Improvement construction project.

(c) Post petition compensation, None.

(d) Roger W. Meyer is a licensed General Contractor, Developer, Property Owner/manager since 1974. He has developed hundreds of projects in residential and commercial throughout California during his career. He managed the development of Center Court Plaza, the asset subject of this Action.

**3.  Disbursing Agent**

City Lights Financial Express, Inc. shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan. A Fund will be established and maintained in a segregated interest-bearing account created under the Plan.

**E.    Risk Factors**

The proposed plan has the following risks:

a)  The longer the Plan takes to be approved will delay the beginning of the anchor lease of Mariner's Healthcare. Time is of the essence.

b)  OSHPD has to approve the final plans, however, OSHPD was presented Preliminary Plans by the architects and it was determined that the best course would be to have the skilled nursing facility entirely on the first floor. An OSHPD consultant to oversee each phase of construction is required during construction which will greatly minimize any risk of non-approval. Once the OSHPD Final Plans are approved, constructions begin.

c) The City of Agoura Hills has already expressed the fact that the area is underserved for skilled nursing facilities and that the building is properly zoned for this type of use. Very low risk.

d) Final approval for financing is required. Very low risk as Preferred Bank has conducted their own appraisal, assessment and risk evaluations and has produced a commitment to lend based on their own due diligence.

e) The result of the two adversary proceedings is both reliant on the plan of reorganization and will affect the cash in hand available for the Plan to move forward.

- *Adversary proceeding 1:11-ap-01384-MT* : One main cause of action is based on the Montecito Bank and Trust overcharging on the default interest rate, therefore altering the total amount due on the secured claim and is an asset to the Debtor.

- *Adversary proceeding 1:11-ap-01385-MT:* For the last 24 months, Roger Meyer has used his personal funds to make payments to the bank in the excess of $2,000,000. Furthermore, Montecito Bank and Trust is holding a Writ of Attachment on personal funds of Center Court Partner's managing member, Roger Meyer in the amount of $324,000.00.

## F.    Other Provisions of the Plan

### 1.    Executory Contracts and Unexpired Leases

#### a.    Assumptions

The following are the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan (see Exhibit C for more detailed information on unexpired leases to be assumed and Exhibit D for more detailed information on executory contracts to be assumed):

Unexpired Leases:

1. AH Healthcare Realty, LLC, a subsidiary of Mariner Healthcare, Inc.

2. Dr. Anita Pakula, M.D.

3. Lab West, Inc.

Executory Contracts

1. Aid Alert Security

2. American Janitorial Services

3. AT&T

4. Farmers Insurance

5. JRM Equities

6. Las Virgenes Water District

7. Southern CA Edison

8. Southern CA Gas Co.

9. ThyssenKrupp Elevator Corp.

10. Vacco HVAC

11. Waste Management GI Ind.

On the Effective Date, each of the unexpired leases and executory contracts listed above shall be assumed as obligations of the reorganized Debtor. The Order of the Court confirming the Plan shall constitute an Order approving the assumption of each lease and contract listed above. If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Section {I.B.3.} of this document for the specific date.

**b. Rejections**

On the Effective Date, the following executory contracts and unexpired leases will be rejected:

<u>None proposed.</u>

The order confirming the Plan shall constitute an Order approving the rejection of the lease or contract. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Section {I.B.3.} of this document for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS _____. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**2. Changes in Rates Subject to Regulatory Commission Approval**

This Debtor <u>is not</u> subject to governmental regulatory commission approval of its rates.

**3. Retention of Jurisdiction**

The Court will retain jurisdiction to the extent provided by law.

**G.    Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability: There will be no tax consequences on the plan because Debtor has no intention of selling the property.

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  These requirements are not the only requirements for confirmation.

**A.    Who May Vote or Object**

**1.  Who May Object to the Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

**2.  Who May Vote to Accept/Reject the Plan**

CCP.032511                                22

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### a.  What is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE WAS ___**not yet determined**___. A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult Exhibits F through L to see how the Proponent has characterized your claim or interest.

### b.  What is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

In this case, the Proponent believes that **classes 1, 2 ,3, 4, 6, and 7** are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponent believes that **class 5** is unimpaired and that holders of claims in each of these classes therefore do not have the right to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

### 3.  Who is <u>Not</u> Entitled to Vote

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8) and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.  Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.  Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section {IV.A.8.}.

### 6.  Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

### 7.  Treatment of Nonaccepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on nonaccepting classes of

claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8. Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The party proposing this Plan will asks <u>the Court</u> to confirm this Plan by cramdown on impaired classes 1 though 6 if any of these classes do not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons: The liquidation value of the Debtor's assets, primarily the twenty-two (22) unit medical condominium project, is less than its fair market value because of the following factors:

a) Based on the appraisal, dated November 2010, the property has a Sale Basis ("As-is") estimated value of $15,700,000; Bulk Value (Less Lease-ups) or Liquidation Value of <u>$10,775,000.</u>

b) Montecito conducted an independent appraisal of the property, October 1, 2010, which was included in the Santa Barbara action. Montecito's appraisal stated an "as-is" value of $7,570,000.

Note: There exists controversy over the correct "as-is" value of the property as two professional appraisals have determined divergent values. The issue of valuation has been reared in both the Santa Barbara and Los Angeles actions a point of contention.

c) Based on the appraisal, dated January 27, 2011; "Subject to Completion" of the Tenant Improvements, Triple Net Lease in place, the property has a value of $25,000,000.

d) Value of the existing Leases:

    i)    Dr. Pakula, M.D. Lease: Modified Gross Value, $5914.30 per month, 21 months remaining; approximately $124,200.30.

    ii)    Lab West, Inc. Lease: Modified Gross Value, $4131.71per month, 22 months remaining, approximately $90,897.62.

    iii)    AH Healthcare Realty, Inc. (Mariner) Lease: Triple Net Value, starting at $100,000 per month; 20 years remaining, approximately <u>$26,400,000 with 2.75% annual escalations after year four</u>. **NOTE: This Lease is valued at <u>$0.00</u> if the Tenant Improvements are not completed per the Agreement.**

    iv)    Center Court Partners, LLC v. Montecito Bank & Trust litigation: valued in a range of $172,000 to $500,000; outcome currently undetermined.

Debtor does not have any other assets available to liquidate. It is important to note that if the Tenant Improvements cannot be completed, the Mariner Lease will be terminated and the Lease will hold no value whatsoever. In Chapter 7 recovery, the bank, Montecito Bank & Trust, would immediately request a Relief from Stay to reclaim/sell/auction the building at their own accord. There are no other viable tangible assets to liquidate. Unsecured creditors would have no recourse as the asset was reverted to the secured creditor, whereas no compensation would be provided to unsecured creditors under Chapter 7 liquidation.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at

least as much under the Plan as such creditor or interest holder would receive under a Chapter 7

liquidation.  (See Exhibit E for a detailed explanation of how the following assets are valued. This

information is provided by Roger Meyer, Managing Member.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## ASSETS VALUE AT LIQUIDATION VALUES (81):

CURRENT ASSETS
    a.  Cash on hand
    b.  Accounts receivable           $24,532.76
    c.  Inventories                       $0
                                      $0

TOTAL CURRENT ASSETS
                                      $24,532.76

FIXED ASSETS
    a.  Office furniture & equipment
    b.  Machinery and equipment     $0
    c.  Automobiles                  $0
    d.  Building & Land             $0
                                    $10,775,000

TOTAL FIXED ASSETS
                                      $10,775,000

OTHER ASSETS
    a.  Customer list
    b.  Other intangibles             $0
                                      $0

TOTAL OTHER ASSETS
                                      $0

**TOTAL ASSETS AT LIQUIDATION VALUE**
                                      $10,799,532.28

**Less:**
Secured creditor's recovery
**Less:**
Chapter 7 trustee fees and expenses     $9,395,093.75
**Less:**
Chapter 11 administrative expenses     $0
**Less:**
Priority claims,                        $33,814
excluding administrative expense claims
**Less:**                               $68,148.20
Debtor's claimed exemptions
                                      $0

    (1)  Balance for unsecured claims     $1,302,476.3
    (2)  Total amount of unsecured claims  $ 6,213,000

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WOULD RECEIVE OR RETAIN IN A CH. 7 LIQUIDATION (2):    = 0%. Ch. 7 Asset Liquidation insufficient to provide protection. As secured credit would reclaim property and there are no other viable assets to liquidate.**

**% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN:    = 87%. Plan provides for 13% reduction of claim of unsecured creditors and payment plan adopted after commencement of the Mariner Lease.**

Below is a demonstration, in tabular format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation.

| CLAIMS & CLASSES (85) | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100% | 100% |
| Priority Tax Claims | 100% | 100% |
| Class 1 – Montecito Bank and Trust | 87% | 100% |
| Class 2 – Roger W. Meyer | Retains ownership at 35% discount | 0% |
| Class 3 – Opal Meyer Survivor's Trust | 87% | 0% |
| Class 4 – City Lights Financial Express, Inc. | 87% | 0% |
| Class 5 – Johnson & Muller | 100% | 0% |

## C.    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date.  The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

| | |
|---|---|
| Cash debtor will have on hand by Effective Date | $14,133,808 |
| **To Pay:** Administrative claims | -0 |
| **To Pay:** Statutory costs & charges | -0 |
| **To Pay:** Other Plan Payments due on Effective Date | -$7,895,000 |
| Balance after paying these amounts………………………………… | $6,238,808 |

The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

| | |
|---|---|
| $ 24,532 | Cash in DIP Account now |
| +9276.03 | Additional cash DIP will accumulate from net earnings between now and Effective Date |
| +12,000,000 | Borrowing |
| +2,100,000 | Capital Contributions |
| +0 | Other |
| $14,133,808 | Total |

Borrowing is from two sources:  $12,000,000 from Preferred Bank (Letter of Intent to lend) and $2,100,000 from City Lights Financial Express, Inc. and will be paid back as follows:

a) Preferred Bank's loan will be a construction loan, trust deed, to fund the Tenant Improvement project that will allow the Mariner lease to commence as agreed.  The loan will encompass, as customary with commercial construction loans, an interest reserve and no payments due until completion of the project.  Upon completion, Debtor will seek take-out financing at favorable terms, possibly from the same lender or another outside source.

b) City Lights Financial Express, Inc.'s cash infusion is in return for 50% of Center Court Partners, LLC, no payback is required other than what is commensurate to being an owner of CCP.

The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments. The Plan proposes to pay the existing secured creditor, Montecito Bank & Trust, 87% of their claim to release the lien and associated guarantees against the property, on the effective date or as soon as practicable.  The Plan proposes to pay the secured creditor, administrative costs, and taxes due in lump on the Effective Date or as soon as practicable thereafter. The remainder of the cash on hand or available credit will be used to complete the design, engineering and Tenant Improvements necessary to commence the Mariner Lease and generate consistent positive cash flow for Center Court Partners, LLC.

The Proponent has provided financial statements which include both historical and projected financial information. Please refer to Exhibit B for the relevant financial statements. YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.

In summary, the Plan proposes to eliminate the obligation to the secured creditor within 60 days of the confirmation of the Plan.  Of the remaining unsecured creditors, Roger Meyer will forego 35% of his claim in order to free up equity in Center Court Partners, LLC.  Unsecured creditor, Opal Meyer Survivor's

Trust will take, upon confirmation of the plan, a note as payment that shall be subordinate to the construction financing. Unsecured creditor, Johnson & Muller Architects will be paid 100% of their claim upon confirmation of the plan as a necessary component of the design, engineering and construction phase of the project. Hence, there will be no other creditors to maintain payments for and thereby no scheduled payments necessary under the Plan. As Debtor's financial projections demonstrate, Debtor will have an average cash flow, after paying operating expenses and post-confirmation taxes, of $3,092.01 of rents collected each month for the life of the Plan. The final Plan payment is expected to be paid fifteen months after the confirmation of the Plan. The Plan Proponent contends that Debtor's financial projections are feasible. As shown by Debtor's historical financial statements, Debtor's average monthly cash flow, after paying operating expenses and post-confirmation taxes, in the three years preceding the filing of this bankruptcy case is $0. Debtor's average monthly cash flow, after paying operating expenses and post-confirmation taxes, during the bankruptcy case is $3,092.01. Furthermore, as discussed earlier in the Disclosure Statement at Section {II.E.4}, Debtor has implemented procedures to decrease costs and increase income.

## V.

## EFFECT OF THE CONFIRMATION OF PLAN

**A.    Discharge**

This Plan provides that upon confirmation of the plan. Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. § 1141. However, the discharge will not discharge any liability imposed by the Plan.

**B.    Revesting of Property in the Debtor**

Except as provided in Section {V.E.}, and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**C.    Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or revoting on the Plan.

CCP.032511                                    31

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**D.      Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

**E.      Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be paid to the United States Trustee on or before the effective date of the plan. Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

**F.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, estate. The automatic stay will be reimposed upon the revested property, but only to  the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

### EXHIBIT A – LIST OF ALL ASSETS (108)

| Asset | Description of Asset | Fair Market Value | Basis of Valuation | Qualifications | Estim. value over time |
|---|---|---|---|---|---|
| 1 | Center Court Plaza 29501 Canwood St Agoura Hills, CA 91301 | $25,000,000 at completion of tenant improvement; $10,775,000 "as-is" | Appraisal based on triple net lease of medical use condos; Appraisal in "as-is" condition | Bill Crosby, California State Certified Real Estate Appraiser (AR015305) | $25,000,000.00 |
| 2 | Lease of Dr. Pakula | $5,914.30 /month | Signed 5 year lease expiring March 2014 | Roger Meyer, landlord and managing member | $124,200.30 Total over 21 months covering the remainder of the lease |
| 3 | Lease of Lab West, Inc | $4,131.71 /month | Signed 5 year lease expiring April 2014 | Roger Meyer, landlord and managing member | $90,897.62 Total over 22 months covering the remainder of the lease |
| 4 | Lease of AH Healthcare Realty, Inc. | $100,000 /month | Signed 20 year lease expiring January 2031 | Roger Meyer, landlord and managing member | |
| 5 | Centercourt v. Montecito Bank | $500,000-$172,000* | Status as a plaintiff in a lawsuit | Roger Meyer, managing member | |
| 6 | General DIP acct xx5584 | $1,437.22 | Current balance as of May MOR | Roger Meyer, managing member | |
| 7 | Cash Collateral Acct xx2743 | $20,092.11 | Current balance as of May MOR | Roger Meyer, managing member | |
| 8 | Tax DIP acct xx0994 | $755.43 | Current balance as of May MOR | Roger Meyer, managing member | |
| 9 | Savings Tax DIP acct xx2495 | $200.01 | Current balance as of May MOR | Roger Meyer, managing member | |
| 10 | Montecito Bank Locked account xx | $2,047.99 | Current balance as of May MOR | Roger Meyer, managing member | |

# EXHIBIT B – FINANCIAL STATEMENTS

As directed by the Court, the historical financial statements for the three years preceding the petition date and projected financial statements for the life of the Plan are attached **(109)**. This information is supplied by Roger W. Meyer, Managing Member and is based on Center Court Partners Financial records, projections, balance sheets, and income and expense statements

Exhibit B.1—Balance Sheets for three years preceding the petition date

Exhibit B.2—Cash Flow Statements for three years preceding the petition date

Exhibit B.3—Income and Expense Statements for three years preceding the petition date

Exhibit B.4—Projected Balance sheets for the life of the Plan

Exhibit B.5—Projected Cash Flow Statements for the life of the Plan

Exhibit B.6—Projected Income and Expense Statements for the life of the Plan

1

**G.      Final Decree**

2          Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan

3   Proponent, or other party as the Court shall designate in the Plan Confirmation Order, shall file a  motion

4   with the Court to obtain a final decree to close the case.

5

6   DATE: 6-20-11

7          Center Court Partners, LLC
           Name of Plan Proponent

8

9          Signature of Plan Proponent,
           Roger Meyer, Managing Member

10

11

12         Signature of Attorney for Plan Proponent

13         Martin D. Gross
           Name of Attorney for Plan Proponent

14

15         Law Office of Martin D. Gross
           Name of Law Firm for Plan Proponent

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## VI.

2

### SUPPORTING VERIFICATION

3      I, Roger Meyer, as Managing Member of Center Court Partners, LLC. declare under

4 penalty of perjury under the laws of the State of California that the foregoing is true and correct.

5 Executed by me this _20_ day of June, 2011 at Agoura Hills, CA.

6

7

8      By: _____

9           Roger Meyer, Managing Member
            Center Court Partners, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CCP.032511                            34

# EXHIBIT B – FINANCIAL STATEMENTS

As directed by the Court, the historical financial statements for the three years preceding the petition date and projected financial statements for the life of the Plan are attached **(109)**. This information is supplied by Roger W. Meyer, Managing Member and is based on Center Court Partners Financial records, projections, balance sheets, and income and expense statements

Exhibit B.1—Balance Sheets for three years preceding the petition date

Exhibit B.2—Cash Flow Statements for three years preceding the petition date

Exhibit B.3—Income and Expense Statements for three years preceding the petition date

Exhibit B.4—Projected Balance sheets for the life of the Plan

Exhibit B.5—Projected Cash Flow Statements for the life of the Plan

Exhibit B.6—Projected Income and Expense Statements for the life of the Plan

Exhibit B.7—First Amendment to the Amended and Restated Lease with AH Healthcare Realty, LLC (Mariner Health care, Inc.)

Exhibit B.8—Letter of Proposal with Preferred Bank

# EXHIBIT  B.1

# Centercourt Partners LLC

# Balance Sheet

## 12/31/2008

### ASSETS

**Current Assets**

| | |
|---|---|
| Cash in Bank | $217,308 |
| Utility Deposit | 1,200 |
| **Total Current Assets** | **$218,508** |

**Fixed Assets**

| | |
|---|---|
| Land | 3,552,764 |
| Buildings | 9,553,411 |
| (less accumulated depreciation) | (31,189) |
| Construction interest and propery taxes | 806,161 |
| (less accumulated amortization) | (25,880) |
| **Total Net Fixed Assets** | **$13,855,267** |

| | |
|---|---|
| **TOTAL ASSETS** | **$14,073,775** |

### LIABILITIES

**Current Liabilities**

| | |
|---|---|
| Short-tern notes payable | $5,194,836 |
| **Total Current Liabilities** | **$5,194,836** |

**Long-term Liabilities**

| | |
|---|---|
| Mortgage | $8,918,049 |
| Other long-term liabilities payable | 6,273 |
| **Total Long-Term Liabilities** | **$8,924,322** |

**Shareholders' Equity**

| | |
|---|---|
| Partners Capital | ($45,383) |
| **Total Shareholders' Equity** | **($45,383)** |

| | |
|---|---|
| **TOTAL LIABILITIES & EQUITY** | **$14,073,775** |

# Centercourt Partners LLC
# Balance Sheet

### 12/31/2009

| ASSETS | |
|---|---|
| **Current Assets** | |
| Cash in Bank | $8,861 |
| Utility Deposit | 1,200 |
| **Total Current Assets** | **$10,061** |
| | |
| **Fixed Assets** | |
| Land | 3,552,764 |
| Buildings | 9,724,609 |
| (less accumulated depreciation) | (370,372) |
| Construction interest & property taxes | 806,161 |
| (less accumulated amortization) | (336,451) |
| **Total Net Fixed Assets** | **$13,376,711** |
| | |
| **TOTAL ASSETS** | **$13,386,772** |

| LIABILITIES | |
|---|---|
| **Current Liabilities** | |
| Short-term notes payable | $5,194,836 |
| **Total Current Liabilities** | **$5,194,836** |
| | |
| **Long-term Liabilities** | |
| Mortgage | $8,918,049 |
| Other long-term notes payable | 794,703 |
| **Total Long-Term Liabilities** | **$9,712,752** |
| | |
| **Shareholders' Equity** | |
| Partners Capital | ($1,520,816) |
| **Total Shareholders' Equity** | **($1,520,816)** |
| | |
| **TOTAL LIABILITIES & EQUITY** | **$13,386,772** |

# Centercourt Partners LLC

# Balance Sheet

### 12/31/2010

| **ASSETS** | | **LIABILITIES** | |
|---|---|---|---|
| **Current Assets** | | **Current Liabilities** | |
| Cash in Bank | $62,603 | Short-term notes payable | $6,036,778 |
| Utility Deposit | 1,200 | Other current liabiliaties | $1,325,805 |
| **Total Current Assets** | $63,803 | **Total Current Liabilities** | $7,362,583 |
| | | | |
| **Fixed Assets** | | **Long-term Liabilities** | |
| Land | 3,552,764 | Mortgage | $8,918,049 |
| Buildings | 9,724,609 | **Total Long-Term Liabilities** | $8,918,049 |
| (less accumulated depreciation) | (630,783) | | |
| Construction interest and property taxes | 806,161 | **Shareholders' Equity** | |
| (less accumulated amortization) | (633,682) | Partners Capital | ($3,397,760) |
| **Total Net Fixed Assets** | $12,819,069 | **Total Shareholders' Equity** | ($3,397,760) |
| | | | |
| | | **TOTAL LIABILITIES & EQUITY** | $12,882,872 |
| | | | |
| **TOTAL ASSETS** | $12,882,872 | | |

# EXHIBIT  B.2

# Centercourt Partners LLC

# Cash Flow Statement

### 01/01/2008 to 12/31/2008

Financial Statements in U.S. Dollars

| | |
|---|---:|
| **Net Income (Loss)** | ($88,570) |
| Depreciation | $31,189 |
| Amortization | $25,880 |
| | |
| Cash Flow | ($31,501) |

# Centercourt Partners LLC

# Cash Flow Statement

### 01/01/2009 to 12/31/2009

Financial Statements in U.S. Dollars

| | |
|---|---|
| **Net Income (Loss)** | ($1,472,061) |
| Depreciation | $339,183 |
| Amortization | $310,571 |
| | |
| Cash Flow | ($822,307) |

# Centercourt Partners LLC

# Cash Flow Statement

### 01/01/2010 to 12/31/2010

Financial Statements in U.S. Dollars

| | |
|---|---:|
| **Net Income (Loss)** | ($1,875,475) |
| Depreciation | $260,411 |
| Amortization | $297,231 |
| Cash Flow | ($1,317,833) |

# EXHIBIT  B.3

# Centercourt Partners LLC

# Income Statement

## 01/01/2008 to 12/31/2008

Financial Statements in U.S. Dollars

**Revenue**

| | | |
|---|---|---|
| Rental Income | $6,186.00 | |
| **Total Profit** | | $6,186.00 |

**Expenses**

| | | |
|---|---|---|
| Advertising | $8,184.00 | |
| Auto and Travel | $425.00 | |
| Legal and other professional fees | $5,573.00 | |
| Repair | $5,113.00 | |
| Taxes | $309.00 | |
| Utilities | $35.00 | |
| Depreciation | $31,189.00 | |
| Amortization | $25,880.00 | |
| Entertainment (50%) | $2,904.00 | |
| Fire & Security Monitor | $195.00 | |
| Office Expense | $3,204.00 | |
| Rental Equipment | $8,408.00 | |
| Telephone Service | $915.00 | |
| Water & Sewer | $2,377.00 | |
| Weed Abatement | $45.00 | |
| **Total Expenses** | | $94,756.00 |
| | | |
| **Net Income (Loss)** | | ($88,570.00) |

# Centercourt Partners LLC

# Income Statement

**01/01/2009 to 12/31/2009**

Financial Statements in U.S. Dollars

**Revenue**

| | | |
|---|---|---|
| Rental Income | $59,086.00 | |
| **Total Profit** | | $59,086.00 |

**Expenses**

| | | |
|---|---|---|
| Advertising | $2,189.00 | |
| Auto and Travel | $14,917.00 | |
| Commissions | $11,896.00 | |
| Insurance | $18,457.00 | |
| Interest | $545,639.00 | |
| Repairs | $53,109.00 | |
| Taxes | $141,923.00 | |
| Utilities | $23,641.00 | |
| Depreciation | $339,183.00 | |
| Accounting | $1,775.00 | |
| Amortization | $310,571.00 | |
| Entertainment (50%) | $3,372.00 | |
| Fees | $1,328.00 | |
| Fire & Security Monitor | $780.00 | |
| Fuel | $7,480.00 | |
| Gardening | $6,250.00 | |
| Janitorial | $2,248.00 | |
| Legal | $8,463.00 | |
| Management Fees | $14,000.00 | |
| Office Expense | $3,472.00 | |
| Paving Retension | $4,157.00 | |
| Pest Control | $75.00 | |
| Plumbing and Electrical | $10,839.00 | |
| Postage | $29.00 | |
| Rental Equipment | $1,458.00 | |
| Telephone | $1,953.00 | |
| Trash Pick Up | $1,943.00 | |
| **Total Expenses** | | $1,531,147.00 |
| | | |
| **Net Income (Loss)** | | ($1,472,061.00) |

# Centercourt Partners LLC

# Income Statement

### 01/01/2010 to 12/31/2010

Financial Statements in U.S. Dollars

| Revenue | | |
|---|---:|---:|
| Rental Income | $119,878.19 | |
| **Total Profit** | | $119,878.19 |

| Expenses | | |
|---|---:|---:|
| Advertising | $1,385.00 | |
| Auto and Travel | $5,848.00 | |
| Legal and Professional Fees | $1,988.00 | |
| Interest Mortgage | $833,289.00 | |
| Repairs | $856.00 | |
| Depreciation | $260,411.00 | |
| Amortization | $297,231.00 | |
| Bad Debt | $499,516.00 | |
| Bank Charges | $55.00 | |
| Entertainment (50%) | $1,419.00 | |
| Fuel | $9,749.00 | |
| Janitorial | $2,100.00 | |
| Office Expense | $822.00 | |
| P.O. Box | $288.00 | |
| Postage | $25.00 | |
| Rental Equipment | $3,001.00 | |
| Supplies | $480.00 | |
| Telephone | $1,571.00 | |
| Utilities & Maintenance | $75,319.00 | |
| **Total Expenses** | | $1,995,353.00 |
| **Net Income (Loss)** | | ($1,875,474.81) |

# EXHIBIT  B.4

# Centercourt Partners LLC

# Estimated Balance Sheet

### 9/30/2012

| ASSETS | |
|---|---|
| **Current Assets** | |
| Cash in Bank | $30,000 |
| Utility Deposit | 0 |
| **Total Current Assets** | $30,000 |
| | |
| **Fixed Assets** | |
| Land | 3,552,764 |
| Buildings | 15,600,000 |
| (less accumulated depreciation) | (959,988) |
| Construction interest and property taxes | 912,500 |
| (less accumulated amortization) | (856,982) |
| **Total Net Fixed Assets** | $18,248,294 |
| | |
| **TOTAL ASSETS** | $18,278,294 |

| LIABILITIES | |
|---|---|
| **Current Liabilities** | |
| Short-term notes payable | $4,346,760 |
| Other current liabiliaties | $200,000 |
| **Total Current Liabilities** | $4,546,760 |
| | |
| **Long-term Liabilities** | |
| Mortgage | $12,000,000 |
| **Total Long-Term Liabilities** | $12,000,000 |
| | |
| **Shareholders' Equity** | |
| Partners Capital | $1,731,534 |
| **Total Shareholders' Equity** | $1,731,534 |
| | |
| **TOTAL LIABILITIES & EQUITY** | $18,278,294 |

# EXHIBIT  B.5

# Centercourt Partners LLC

# Cash Flow Statement

### 07/01/2011 to 09/30/2012

Financial Statements in U.S. Dollars

| | |
|---|---:|
| **Net Income (Loss)** | ($2,552,883) |
| Depreciation | $959,988 |
| Amortization | $856,982 |
| | |
| Cash Flow | ($735,913) |

# Centercourt Partners LLC

# Estimate Cash Flow Statement

### 10/1/2012 to 12/31/2012

### After the commencement of the Mariner Lease

Financial Statements in U.S. Dollars

## Revenue

| | | |
|---|---:|---:|
| Rental Income | $330,135.00 | |
| **Total Profit** | | $330,135.00 |

## Expenses

| | | |
|---|---:|---:|
| Advertising | $0.00 | |
| Auto and Travel | $0.00 | |
| Legal and Professional Fees | $2,500.00 | |
| Interest Mortgage | $195,000.00 | |
| Repairs | $1,000.00 | |
| Bank Charges | $0.00 | |
| Entertainment (50%) | $0.00 | |
| Fuel | $0.00 | |
| Janitorial | $750.00 | |
| Office Expense | $250.00 | |
| P.O. Box | $72.00 | |
| Postage | $10.00 | |
| Rental Equipment | $0.00 | |
| Supplies | $100.00 | |
| Telephone | $480.00 | |
| Utilities & Maintenance | $6,000.00 | |
| **Total Expenses** | | $206,162.00 |
| **Net Income** | | $123,973.00 |

# EXHIBIT  B.6

# Centercourt Partners LLC

# Estimate Income Statement

**07/01/2011 to 09/30/2012**

Financial Statements in U.S. Dollars

**Revenue**

| | | |
|---|---|---|
| Rental Income | $250,690.00 | |
| **Total Profit** | | $250,690.00 |

**Expenses**

| | | |
|---|---|---|
| Advertising | $1,500.00 | |
| Auto and Travel | $0.00 | |
| Legal and Professional Fees | $30,000.00 | |
| Interest Mortgage | $812,500.00 | |
| Repairs | $1,500.00 | |
| Depreciation | $959,988.00 | |
| Amortization | $856,982.00 | |
| Bank Charges | $50.00 | |
| Entertainment (50%) | $0.00 | |
| Fuel | $0.00 | |
| Janitorial | $2,600.00 | |
| Office Expense | $750.00 | |
| P.O. Box | $288.00 | |
| Postage | $25.00 | |
| Rental Equipment | $2,000.00 | |
| Supplies | $300.00 | |
| Telephone | $2,400.00 | |
| Utilities & Maintenance | $127,500.00 | |
| **Total Expenses** | | $2,798,383.00 |
| | | |
| **Net Income (Loss)** | | ($2,547,693.00) |

**EXHIBIT C – UNEXPIRED LEASES TO BE ASSUMED (109a)**

| LEASES | ARREARS/DMGS | METHODS OF CURE |
|---|---|---|
| • Description = first floor Medical use condos, 29501 Canwood St, Agoura Hills, CA 91301<br><br>• Lessor's name = Center Court Partners, LLC<br><br>• Lessee's name = AH Healthcare Realty, LLC<br><br>• Expiration date = Jan 2031 | • Default amt = None<br>• Actual pecuniary loss = None | • Means of assuring future performance = Completing Tenant Improvements |
| • Description = Medical Use Condo, 29501 Canwood St, Agoura Hills, CA 91301<br><br>• Lessor's name = Center Court Partners, LLC<br><br>• Lessee's name = Dr. Pakula, MD<br><br>• Expiration date = March 2014 | • Default amt = None<br>• Actual pecuniary loss = None | • Means of assuring future performance = performance guaranteed |
| • Description = Medical Use Condo, 29501 Canwood St, Agoura Hills, CA 91301<br><br>• Lessor's name = Center Court Partners, LLC<br><br>• Lessee's name = Lab West, Inc.<br><br>• Expiration date = April 2014 | • Default amt = None<br>• Actual pecuniary loss = None | • Means of assuring future performance = Performance guaranteed |

CCP.032511

37

## EXHIBIT D – EXECUTORY CONTRACTS TO BE ASSUMED

| Executory Contract | Frequency of Payments (Mo/Qtr) | Amount of Payment | Post-Petition payments not made (Number) | Total in Due | Method of Cure |
|---|---|---|---|---|---|
| Aid Alert Security | every three months | $130 | 0 | 0.00 | Not in Default |
| Amer. Janitorial Services | monthly | $150 | 1 | $150.00 | Pay in full once Cash Collateral is approved |
| AT&T | monthly | $154.23 | 2 | $308.46 | Pay in full once Cash Collateral is approved |
| Farmers Insurance | bi-annually | $4,656 | 0 | 0.00 | Not in Default |
| JRM Equities-landscape | monthly | $550 | 0 | 0.00 | Not in Default |
| JRM Equities-property | monthly | $2,000 | 0 | 0.00 | Not in Default |
| Las Virgenes Water Dist. | monthly | $700 | 0 | 0.00 | Not in Default |
| Southern CA Edison | monthly | $950 | 1 | $715.32 | Pay in full once Cash Collateral is approved |
| Southern CA Gas Co. | monthly | $300 | 0 | 0.00 | Not in Default |
| ThyssenKrupp Elevator | monthly | $491 | 2 | $981.04 | Pay in full once Cash Collateral is approved |
| Vacco HVAC | monthly | $240 | 0 | 0.00 | Not in Default |
| Waste Management | monthly | $226 | 0 | 0.00 | Not in Default |
| | | | TOTAL DUE: | $2,154.82 | |

## EXHIBIT E – LIQUIDATION ANALYSIS

## SUPPORTING VALUATION

**CURRENT ASSETS**

**CASH ON HAND (113)**

| | | | |
|---|---|---|---|
| a. | Acct Number: xx5584 | $1,437.22 | |
| b. | Acct Number: xx2743 | $20,092.11 | |
| c. | Acct Number: xx0994 | $755.43 | |
| d. | Acct Number: xx2495 | $200.01 | |
| e. | Acct Number: xx0708 | $2,047.99 | |
| f. | Total Cash | | $24,532.76 |

**ACCOUNTS RECEIVABLE**

| | | | |
|---|---|---|---|
| a. | Accounts receivable | $0 | |
| b. | **Less**: uncollectible accounts | $0 | |
| c. | Net Accounts Receivables | | $0 |

**INVENTORIES (114)**                                              $0

**FIXED ASSETS:**

**OFFICE FURNITURE, MACHINERY, & EQUIPMENT (115)**        $0

**TRANSPORTATION EQUIPMENT (116)**                        $0

**BUILDINGS, LAND, AND OTHER REAL PROPERTY (117)**

| | | | |
|---|---|---|---|
| a. | Real Property at: | $10,775,000 | |
| b. | Total | | $10,775,000 |

**OTHER ASSETS (118):**                                    $0

TOTAL ASSETS AT LIQUIDATION VALUE                        $10,799,532.28

CCP.032511                        39

EXHIBIT F – LIST OF ADMINISTRATIVE EXPENSE CLAIMS

## UNCLASSIFIED CLAIMS: ADMINISTRATIVE CLAIMS

| Name | Code § | Amounts (Allowed + Estimated = Total Amount - Paid = Total Due) | | | | |
|---|---|---|---|---|---|---|
| | | Allowed to date | Estimated | Total Amount Accrued during plan | Paid | Total Due |
| Clerk's Office | §507(a)(1) | $1,539.00 | $0.00 | $1,539.00 | $1,539.00 | $0.00 |
| US Trustee | §507(a)(1) | $325.00 | $1,950.00* | $2,275.00 | $325.00 | $1,950.00 |
| Martin D. Gross | §503(4) | $7,500.00 | $28,000.00* | $30,000.00 | $2,000.00 | $28,000.00 |
| Rocky V. Ortega | §503(4) | Unknown | | | | |
| Jack Humes | §503(4) | Unknown | | | | |
| | | | | | | |
| ⇨  Insert rows here | | | | | | |
| **TOTAL AMOUNTS** | | $3,364.00 | $30,450.00 | $33,814.00 | $29,364.00 | $29,950.00 |

**\*Estimated amount based on Quarterly fees and other amounts throughout the life of the plan, 12-15 months**

F 3017-1

## EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS

### CLASSIFIED CLAIMS: §507(a)(3) PRIORITY CLAIMS

| Class | Name | Insider | Impaired | SCHEDULED CLAIMS | | FILED CLAIMS | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| | None | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL AMOUNT FOR CLASS | | | | | | | |

* Disputed/contingent/unliquidated

Revised October 2010

41

F 3017-1

EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS

CLASSIFIED CLAIMS: §507(a)(4) PRIORITY CLAIMS

| Class | Name | Insider | Impaired | SCHEDULED CLAIMS | | FILED CLAIMS | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| | None | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **TOTAL AMOUNT FOR CLASS** | | | | | | | |

\* Disputed/contingent/unliquidated

Revised October 2010

42

F 3017-1

EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS

## CLASSIFIED CLAIMS: §507(a)(5) PRIORITY CLAIMS

| Class | Name | Insider | Impaired | SCHEDULED CLAIMS | | FILED CLAIMS | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| | None | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL AMOUNT FOR CLASS | | | | | | | |

* Disputed/contingent/unliquidated

Revised October 2010

43

F 3017-1

EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS

## CLASSIFIED CLAIMS: §507(a)(6) PRIORITY CLAIMS

| Class | Name | Insider | Impaired | SCHEDULED CLAIMS | | FILED CLAIMS | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| | None | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL AMOUNT FOR CLASS | | | | | | | |

* Disputed/contingent/unliquidated

Revised October 2010

44

F 3017-1

## EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS

### CLASSIFIED CLAIMS: §507(a)(7) PRIORITY CLAIMS

| Class | Name | Insider | Impaired | SCHEDULED CLAIMS | | FILED CLAIMS | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| | None | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL AMOUNT FOR CLASS | | | | | | | |

* Disputed/contingent/unliquidated

Revised October 2010

45

F 3017-1

EXHIBIT G – LIST OF PRIORITY UNSECURED CLAIMS

## CLASSIFIED CLAIMS: §507(a)(8) PRIORITY CLAIMS

| Class | Name | Insider | Impaired | Scheduled Claims | | Filed Claims | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| | Property Tax | N | Not impaired | $68,148.20 | $0 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL AMOUNTS FOR CLASS | | | | $68,148.20 | | | |

* Disputed/contingent/unliquidated

Revised October 2010

46

F 3017-1

EXHIBIT H – LIST OF GENERAL UNSECURED CLAIMS

## CLASSIFIED CLAIMS: UNSECURED CLAIMS

| Class | Name | Insider | Impaired | SCHEDULED CLAIMS | | FILED CLAIMS | |
|---|---|---|---|---|---|---|---|
| | | | | Amount | D/C/U* | Amount | Objection |
| 2 | Roger W. Meyer | Y | Impaired | $4,600,000.00 | $0 | | |
| 3 | Opal Meyer Survivor's Trust | Y | Impaired | $1,400,000.00 | $0 | | |
| 4 | City Lights Financial Express, Inc. | N | Impaired | $148,000.00 | $0 | | |
| 5 | Johnson Muller Architects | N | Not-Impaired | $65,000.00 | $0 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | TOTAL AMOUNT FOR CLASS | | | $6,213,000.00 | $0 | | |

* Disputed/contingent/unliquidated

Revised October 2010

47

F 3017-1

EXHIBIT I – LIST OF EQUITY INTERESTS

CLASSIFIED INTEREST: EQUITY SECURITY INTEREST HOLDERS

| Class | Name | Insider | Impaired | SCHEDULED INTERESTS | | FILED INTERESTS | |
| | | | | Percentage | D/C/U* | Percentage | Objection |
|---|---|---|---|---|---|---|---|
| 6 | Roger W. Meyer | Y | Impaired | 91.5% | n/a | | |
| 7 | Karen Meyer | Y | Impaired | 8.5% | n/a | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

* Disputed/contingent/unliquidated

Revised October 2010

48

F 3017-1

# EXHIBIT  B.7

## FIRST AMENDMENT TO AMENDED AND RESTATED LEASE

**THIS FIRST AMENDMENT TO LEASE** (this "Amendment"), is dated as of this
day of April, 2011 by and between **CENTERCOURT PARTNERS, LLC**, a California limited
liability company (the **"Landlord"**), and **AH HEALTHCARE REALTY, LLC**, a Delaware
limited liability company having an address at c/o Mariner Health Care, Inc., One Ravinia Drive,
Suite 1200, Atlanta, GA 30346 (the **"Tenant"**).

## W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant are the current parties under that certain Amended
and Restated Lease agreement dated February 22, 2011 (as modified and amended the "**Existing
Lease**") which amended and restated in its entirety that certain Lease, dated December 6, 2010,
between the parties, for the real property, including, without limitation, the entire existing
building known as "Center Court Plaza" (the **"Building"**) and located at 29501 Canwood Street,
Agoura Hills, CA 91301 (the **"Original Premises"**);

**WHEREAS**, due to the disapproval of OSHPD on the existing Building's second floor
improvements, Landlord and Tenant have decided to amend the Original Premises to remove the
second story of the Building and to include the addition of approximately 11,900 square feet to
the first floor of the Building as more particularly described herein and shown on Exhibit A
attached hereto and made a part hereof (the **"New Premises"**);

**WHEREAS**, Landlord agrees to take all necessary steps to convert the Project into a
condominium consisting of twelve (12) separate units, the New Premises being one unit and the
second (2nd) floor consisting of 11 units (the **"Second Floor"**).    All twelve units shall be
separately assessed for real estate tax purposes and separately metered for utilities purpose,
substantially in accordance with the Plans; and

**WHEREAS**, Landlord and Tenant desire to further amend the Lease upon the term and
conditions hereinafter set forth.

**NOW THEREFORE**, in consideration on the mutual agreements hereinafter set forth
and other good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, Landlord and Tenant hereby agree as follows:

1.    DEFINITIONS.

      (a)    Any capitalized term used but not defined in this Amendment will have
the meaning assigned to such term in the Existing Lease.

      (b)    From and after the date of this Amendment, each reference in the
Existing Lease to the Lease means the Existing Lease as modified by this Amendment and each
reference to the Premises means the New Premises.

      (c)    The following definitions are amended and restated in their entirety:

      (i)    **"Legal Requirements"** shall mean all laws, statutes, codes,
ordinances, orders and regulations of any or all of the federal, state or local government or
governmental (or quasi-governmental) authority having jurisdiction over the land on which the

Building is located (the "**Land**"), the Improvements, the Building, the Skilled Nursing Facility and/or the Premises, whether now or hereafter in force.

(ii)    "**Improvements**" shall mean the portion in the exclusive possession of Tenant of all buildings, including the existing Building, improvements, structures, sidewalks and parking areas, now or hereafter erected on the Land and all alterations, renewals and replacements thereof, additions thereto and substitutions therefore, together with all fixtures, machinery and equipment of every kind and nature whatsoever now or hereafter affixed or attached to such structures and improvements.

(iii)    "**Appurtenances**" shall mean all, rights, privileges and easements belonging or pertaining to the Land, Improvements, Premises and Building.

(iv)    "**Unit**" or "**Units**" shall mean the Premises and the 11 condominium units on the Second Floor.

2.    DEMISE OF THE PREMISES.  Section 1.01 of the Existing Lease is hereby amended and restated as follows:

"1.01    Demise of Premises.

(a)    Landlord hereby demises and leases to Tenant, and Tenant hereby hires and takes from Landlord, subject to and with the benefit of the terms, covenants, conditions and provisions of this Lease, (i) the entire existing first (1st) floor of the Building which is approximately 23,555 rentable square feet, as well as, (ii) subject to the approval of the City of Agoura Hills Planning Commission, (A) an additional approximately 11,900 rentable square feet to be built as an addition on the South side of the to the existing first (1st) floor of the Building by Landlord, and (B) approximately 7,000 square feet of area to be improved by Landlord in the subterranean level; with the entire demised premises totaling approximately 42,400 rentable square feet of area and all as more particularly shown on Exhibit A attached hereto and made a part hereof.

(b)    In addition to Tenant's rights to use and occupy the Premises as hereinafter specified, Tenant shall have non-exclusive right so the Common Areas (as hereinafter specified), but shall not have any rights to the roof, the exterior walls, the area above the dropped ceilings, or the utility raceways of the building containing the Premises.  The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings, structures, and improvements thereon, are herein collectively referred to as the "**Project.**"  The Project consists of approximately 66,000 rentable square feet; together with approximately 22,000 square feet of subterranean level, currently improved for unreserved parking and Building support services, and exterior unreserved parking and landscape.

(c)    The Premises defined above includes the area of the Building known as "Suite 101".  Landlord and Tenant acknowledge that Suite 101 is currently leased by Landlord to a third party (the "**Suite 101 Tenant**") pursuant to a Lease between Landlord and the Suite 101 Tenant (the "**Suite 101 Lease**").  Upon the execution of the Lease, Landlord, at Landlord's sole cost and expense, shall negotiate with the Suite 101 Tenant to terminate the Suite 101 Lease or move the Suite 101 Tenant to any of the available Second Floor suites. If Landlord is not able to terminate the Suite 101 Lease or move the Suite 101 Tenant to another suite within the Building, then Tenant shall have the right to terminate the Lease, and thereafter neither party shall have any

further rights or obligations hereunder and (a) this Lease shall terminate and be of no further force or effect, except for any provision that expressly survives termination of this Lease, and (ii) if the Lease is terminated pursuant to this paragraph 1.01(b), then Tenant shall receive a return of the Security Deposit and any Rent or other payments which have been paid by Tenant to Landlord (other than the $50,000 paid to Landlord pursuant to Section 3.01(d)(i)).

(d)    Landlord has, in place, an approved and recorded condominium plan, consisting of twenty-two (22) separate units. Landlord agrees, at Landlord's sole expense, to modify the existing condominium plan to include the new addition to the first floor of the Building and combine the existing eleven (11) units on the first floor plus the new addition, plus the improved space on the subterranean level into one (1) condominium unit and record said modification with all proper legal authorities. Landlord will provide Tenant with copies of the current documents governing the condominium and will submit the revised condominium documents allowing for the new addition and combination of units (the "New Condominium Documents") to be reviewed and approved by Tenant. The New Condominium Documents shall provide that Tenant will have the number of seats on any managing body of the Condominium in accordance with its Pro Rata Share (as hereinafter defined) and that Tenant's Unit may be used for any lawful purpose permitted under applicable law and neither Landlord, its appointee, or any managing body of the Condominium will have any right to restrict or limit any lawful use of Tenant's Unit. Notwithstanding the foregoing, if the Condominium conversion is not complete on or before June 30, 2012, Tenant shall have the right to terminate the Lease and receive a return of the Security Deposit and any Rent which has been paid by Tenant to Landlord."

3.  TERM.  Section 2.01 of the Existing Lease is hereby amended and restated as follows:

"2.01    Term.  The term of this Lease (the "Initial Term") shall be twenty (20) years, to commence (the "Commencement Date") on the later of the date that (a) all of the Landlord Improvements (as hereinafter defined) are completed and approved for Medicare and Medicaid patient occupancy by all requisite authorities including but limited to OSHPD and, (b) the Conditions (as hereinafter defined) are met. The Lease shall end, unless renewed or extended, at 11:59 p.m. on the day preceding the twentieth anniversary of the Commencement Date (the "Expiration Date"). Notwithstanding the foregoing, if the Commencement Date does not occur on or before June 30, 2012, Tenant shall have the right to terminate the Lease and receive a return of the Security Deposit and any Rent which has been paid by Tenant to Landlord, provided, however, Landlord shall have the right to exercise one (1) four (4) month extension."

4.  BASE RENT.

(A)    Section 3.01(a) of the Existing Lease is hereby amended and restated as follows:

"(a)    During the first and second Lease Year, Tenant shall pay to Landlord annual base rent in the amount of ONE MILLION TWO HUNDRED THOUSAND DOLLARS and 00/100 ($1,200,000.00), payable in monthly installments of ONE HUNDRED THOUSAND DOLLARS and 00/100 ($100,000.00) (as may be increased or decreased as provided herein, "Base Rent")."

(B)    Section 3.01(d) of the Existing Lease is hereby amended and restated as follows:

"(d)    Tenant shall pay the first month's Base Rent as follows: (i) $50,000 upon the execution of this Lease, which amount shall be non-refundable to Tenant

upon payment of same to Landlord (which Landlord acknowledges has been paid); and (ii) $100,000 upon the latest of (1) Tenant's final approval of the Plans (as hereinafter defined), (2) the date the Conditions are met, (3) the date Landlord makes all required deliveries under the Lease, including but not limited to, the Non-Disturbance Agreement as required by Section 12.02 of the Lease and the Exhibits to this Amendment, and (4) the Suite 101 Termination Date; provided, however, that the Suite 101 Lease is terminated on or before the Suite 101 Termination Date. If the Suite 101 Lease is not terminated prior to Suite 101 Termination Date and Tenant terminates this Lease pursuant to Section 1.01(b) of this Lease, then Tenant shall not be obligated to make the payment of the $100,000 or any other amounts to Landlord."

5.  SECURITY DEPOSIT.  Section 3.04 of the Existing Lease is hereby amended and restated as follows:

"3.04  Security Deposit.  On the Commencement Date, Tenant will deposit with Landlord the sum of **$100,000.00** as security for the faithful performance and observance by Tenant of the terms, provisions and conditions of this Lease. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the security shall be returned to Tenant within fifteen (15) days after the date fixed as the end of the Lease and after delivery of entire possession of the Premises to Landlord. Notwithstanding the foregoing, if the Commencement Date does not occur on or before April 30, 2012, and Tenant exercises its right to terminate the Lease, Landlord shall immediately return the Security Deposit to Tenant."

6.  TAXES.  A new paragraph 4.03 is hereby added to the Lease as follows:

"4.03  Units Not Separately Assessed.  Notwithstanding anything to the contrary contained herein, unless and until the Units are separately assessed for tax purposes, Tenant shall only be responsible for its share of the Taxes attributable to the Premises."

7.  SERVICES AND UTILITIES.

(A)  The second sentence of Section 5.01(a) is hereby deleted in its entirety.

(B)  A new paragraph 5.02 is hereby added to the Lease as follows:

"5.02  Units Not Separately Metered.  Notwithstanding the foregoing, unless and until the Units are separately metered so that each Unit's utilities and other services can be separately charged, than Tenant shall only be responsible for its share of the utilities and services provided to the Premises."

8.  LANDLORD IMPROVEMENTS; CONSTRUCTION TIMELINE; REPAIRS AND MAINTENANCE.  Article 7 is hereby amended and restated in its entirety as follows:

"7.01  Landlord Improvements.  Landlord shall modify the Project so that the condominium is made up of twelve Units and build out the Premises for use by Tenant as a Skilled Nursing Facility that meets and receives all applicable Governmental Approvals in accordance with the Plans, including a one-story First Floor addition, of approximately 11,500 square feet which will be extended on the South side of the existing structure facing the freeway and improving approximately 7,000 square feet of area in the subterranean level ("**Landlord**

**Improvements"**), substantially in accordance with the plans and specifications prepared by
_____ (the **"Plans"**), copies of which have been provided to
and approved by Tenant's architects. Specific construction and physical plant specifications and
requirements shall be substantially as set forth in the Plans. Notwithstanding anything to the
contrary contained herein, if the City of Agoura Hills Planning Commission does not approve the
Plans prior to June 30, 2012, Tenant shall have the right to terminate this Lease and neither party
shall have any further rights or obligations hereunder and (a) this Lease shall terminate and be of
no further force or effect, except for any provision that expressly survives termination of this
Lease, and (ii) if the Lease is terminated pursuant to this paragraph 7.01, then Landlord shall be
entitled to retain any monies previously paid by Tenant to Landlord prior to such termination.
Landlord and Tenant shall work closely with Landlord's architects to determine the best Value
Engineering Plans and cost savings benefits for all parties. Tenant shall have the right to engage
an interior designer/space planner of its choice for the preparation of design work and preliminary
and working drawings, provided however, such design work must be reasonably approved by
Landlord and must conform with OSHPD Building Standards.

7.02  Landlord's Work.  Landlord shall commence and thereafter diligently prosecute to
completion the construction of the work required of it by the Plans and the General Conditions
and Specifications attached hereto and made a part hereof as Exhibit C, which work is
collectively called **"Landlord's Work"** hereinafter.  Landlord shall properly and in a
workmanlike manner complete Landlord's Work and the date of completion shall be certified in
writing by the parties hereto forthwith upon such completion. Landlord shall make no changes in
such work without, in each instance, obtaining Tenant's prior written consent thereto. Landlord
agrees to cause its contractor to schedule and perform Landlord's Work in such a manner so as to
minimize interference with the performance of Tenant's Work, if any, to be done during the
performance of Landlord's Work. The opening of the Premises for the conduct of business shall
not constitute an acceptance of Landlord's Work, and Landlord shall promptly correct any and all
work not done in a proper or workmanlike manner or which is not in accordance with the Plans.
Landlord shall guarantee all work done by it for a period of one (1) year from the date Tenant
opens the Premises for business and also guarantee against all latent defects.  In addition,
Landlord shall assign to Tenant or enforce for Tenant's benefit any and all guarantees or respect
to Landlord's Work.

7.03  Conditions.  Landlord shall take all necessary steps to modify the Project into a
condominium consisting of twelve (12) separate units, the Premises being one unit and Second
Floor consisting of eleven (11) separate units, which shall be separately assessed for real estate
tax purposes and separately metered for utilities purpose, substantially in accordance with the
Plans. The improvements shall upon issuance of the permanent certificate of occupancy for the
Building, be in compliance with all applicable zoning codes of the City of Agoura Hills and other
applicable regulations, codes and governmental requirements, including but not limited to, all
applicable regulations, codes and governmental requirements governing buildings, condominiums
and nursing facilities. It is anticipated that the Landlord Improvements will be substantially
completed on or before June 30, 2012. The Building shall be deemed fully completed in
accordance with the Plans on the thirtieth (30th) day after completion of Landlord's Work and
delivery of the Premises, provided (a) a temporary or permanent Certificate of Occupancy for the
Building shall have been issued by the Department of Buildings of the City of Agoura Hills, and
(b) Landlord's architect or engineer shall have certified that the Building has been substantially
completed in accordance with the Plans except for (i) work in the Units to be done by Tenant or
the tenants, (ii) work in the Building customarily left incomplete until after occupancy and (iii)
punch list items, (c) Tenant's architect approves such certification by Landlord's architect, (d) the
proper authorities approve the Condominium, and (e) Tenant is then legally entitled to conduct

business at the Premises as constructed in accordance with this Lease (e.g., Landlord has obtained all necessary permits, licenses, or certificates of occupancy and has removed all violations against the Premises, if any) (subsections (a) through (e) shall collectively be referred to as, the **"Conditions"**).

7.04    Construction Timeline. Landlord estimates that the timeline for design, plan check, and construction is twelve (12) to fifteen (15) months from the Original Lease Commencement Date (the **"Construction Period"**). During the Construction Period, Landlord shall be solely responsible for space planning, working drawings, permits/governmental approvals, and construction, provided however, all such work shall be done in accordance with the Plans. Landlord must receive the written consent of Tenant, such consent not to be unreasonably withheld, to any changes to the Plans. The parties hereby acknowledge that the Construction Period may be extended if, and only if, the parties have not received the applicable Governmental Approvals, however, notwithstanding the foregoing, if the Commencement Date does not occur on or before June 30, 2012, Tenant shall have the right to terminate the Lease.

7.05    Repairs and Maintenance.

Throughout the term of this Lease, Tenant, at its sole cost and expense, shall take good care of the Premises, including, without limiting the generality of the foregoing, all equipment, fixtures and articles of personal property therein or thereon. Tenant shall be responsible for all sidewalks, grounds, areas, vaults, chutes, sidewalk hoists, railings, gutters, alleys and curbs in front of or adjacent to the Premises and will put, keep and maintain the same in good and safe order and condition, and make all repairs therein and thereon, interior and exterior, structural and nonstructural, ordinary and extraordinary, and unforeseen and foreseen, necessary to keep the same in good and safe order and condition, howsoever the necessity or desirability therefor may occur, and whether or not necessitated by obsolescence or defects, latent or otherwise, but reasonable wear and tear excepted; provided however, Tenant shall be reimbursed, within five (5) days of request therefore to Landlord, any amount paid over Tenant's Pro Rata Share. When used in this Section, the term **"repairs"** shall include all necessary replacements, renewal, alterations and additions.

Tenant shall keep clean and free from dirt, snow, ice, rubbish, obstructions and encumbrances, the sidewalks, areas, vaults, chutes, sidewalk hoists, railings, gutters, alleys and curbs in front of or adjacent to the Premises; provided however, Tenant shall be reimbursed, within five (5) days of request therefore to Landlord, any amount paid over Tenant's Pro Rata Share."

9.    DAMAGE AND DESTRUCTION.    Section 15.01 of the Existing Lease shall be amended as follows:

"15.01    Landlord's Restoration Work.

(a)    If less than twenty-five (25%) percent of the Premises shall be partially destroyed or damaged by fire or other casualty of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, Tenant shall give to Landlord prompt notice thereof, and Tenant shall at its own cost and expense (subject to Section 15.02 hereof), promptly repair, restore, replace and rebuild the same, at least to the extent of the value and as nearly as possible to the character of the Premises existing immediately prior to such occurrence; and Landlord shall in no event be called upon to repair, replace, restore or rebuild the Premises but shall be required to repair, replace or restore any of the Common Areas of the Building or any portion thereof.

(b)     In the event of a total or more than twenty-five (25%) percent of the Premises shall be destroyed during the term or any extension hereof, except as set forth below. Landlord shall be obligated to and shall promptly and diligently, and at its sole cost and expense, rebuild   and restore the Premises and the Common Area, including all improvements, betterments, appurtenances equipment, utilities, facilities and installations (regardless of by whom they have been installed or constructed) to their prior condition as if no destruction or damages had occurred, all in accordance with plans  and specifications to be prepared by Landlord, at its sole cost and expense, and approved by Tenant before commencement of any rebuilding or restoration, which approval Tenant agrees not to unreasonably delay or withhold; provided however, Tenant shall deliver to Landlord any insurance proceeds theretofore received by Tenant on account of such damage or destruction and shall assign to Landlord all of Tenant's right, title and interest in and to any further proceeds with respect thereto. If any destruction or damage to the Premises or Common Area is such as to prevent the operation of the Tenant's business being conducted on the Premises, or to make it impractical so to do, then the minimum annual fixed rent, taxes and any other charges to be paid by Tenant hereunder shall abate from the occurrence of any destruction of damage up to and including the time that the Premises or Common Area have been rebuilt or restored to their prior condition as if no destruction or damage had occurred.  The amount of the abatement of each such charge is to be determined by taking a fraction, the numerator of which shall be the square foot area which, as direct or indirect result of such destruction or damage, is unusable in the operation of Tenant's business in the Premises and the denominator of which shall be the ground floor area (initially 50,055 square feet) of the Premises at the time of the destruction.      Anything herein contained to the contrary notwithstanding, if Landlord does not exert its best efforts to take all steps necessary and available within Landlord's control to diligently commence to restore the Premises pursuant to this Article within forty-five (45) days after any destruction, Tenant at its sole option may terminate this Lease by written notice to Landlord."

10.  RIGHT OF FIRST REFUSAL.  A new Section 25.03 shall be added to the Lease as follows:

"25.03  Right of First Refusal.  If during the term of the Lease (i.e. at any time prior to or after an Option Commencement Period), Landlord receives a bona fide written offer for the sale of the Premises, all or part of the Second Floor or for the entire Project from any third person or entity which Landlord desires to accept, Landlord shall notify Tenant of such offer in writing, which notification shall contain a copy of the bona fide written offer.  Tenant shall then have thirty (30) days after receipt of the notice and bona fide written offer in which the elect to purchase the Premises, all or part of the Second Floor or for the entire Project on the same terms and conditions as those contained in the bona fide written offer.  Such election shall be made by written notice to Landlord and as soon as practicable thereafter the parties shall enter into a formal contract for the sale of the Premises, all or part of the Second Floor or for the entire Project containing all terms of the original bona fide written offer made to Landlord, except as the parties may mutually agree to the contrary.  If Tenant fails to give the notice, or if Tenant fails to enter into the contract of sale, as provided herein, Landlord shall have the right to accept the bona fide written offer, but shall not accept any other offer at a lower price, or on terms materially more favorable to the third party purchaser, than that contained in the bona fide written offer, without first again granting Tenant the right to purchase the Premises, all or part of the Second Floor or for the entire Project (as applicable) as aforesaid.  In the event Landlord does not accept the bona fide written offer within thirty (30) days after Tenant fails to exercise its right of first refusal with respect to the Premises, all or part of the Second Floor or for the entire Project as granted herein, or within thirty (30) days after Tenant notifies Landlord that it declines to exercise its right of first refusal, or if the contract with the third party is thereafter terminated for any

reason, Landlord shall again give Tenant the right to purchase the Premises, all or part of the Second Floor or for the entire Project (as applicable) as set forth herein before accepting the bona fide written offer or any other bona fide written offer. The Lease shall survive the sale of the Premises, all or part of the Second Floor or for the entire Project to a third party and this provision shall be binding on any subsequent owner of the Premises, all or part of the Second Floor or for the entire Project."

11.   PURCHASE OPTION.   Article 26 of the Existing Lease shall be amended as follows:

"26.01   Landlord hereby grants to Tenant an option (the "Option") to purchase the Project upon the terms and conditions hereinafter set forth.

26.02   Tenant may elect to exercise the Option at any time within the Option Commencement Period (as hereinafter defined) by giving written notice to Landlord ("Option Notice"), in which Option Notice Tenant shall set forth a date for the closing of title of the purchase of the Project (the "Closing"), which date shall not be earlier than ten (10) nor later than ninety (90) days after the date of the giving of the Option Notice by Tenant. If Tenant gives the Option Notice to Landlord in accordance with the foregoing provisions, then Landlord shall become obligated to sell and Tenant shall become obligated to purchase the Project for a purchase price determined pursuant to the formula set forth below (the "Purchase Price"), and upon all of the other terms and conditions set forth in this Lease.

26.03   The formula for the Purchase Price shall be TWELVE MONTHS BASE RENT DIVIDED BY A CAP RATE OF 7.5% (e.g. $1,200,000 / 0.075 = $16,000,000 Purchase Price).

26.04   The "Option Commencement Period" shall mean the date which is the first day of the fourth (4th) Lease Year, extending for a period of thirty (30) days, and/or on the anniversary of each year of the Initial Term of the Lease thereafter, extending for a period of thirty (30) days."

12.  COMMON AREAS.  A new Article 28 is hereby added to the Lease as follows:

"28. COMMON AREAS

28.01     Right to Use Common Area.  "Common Areas" shall mean the common entrances, lobbies, corridors, stairwells, public restrooms, elevators, parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.  Landlord grants to Tenant, for the benefit of Tenant and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Tenant under the terms hereof or under the terms of the Rules and Regulations governing the use of the Project (and subject to the Condominium Documents once such documents are in effect). Under no circumstance shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of the Landlord or Landlord's designated agent, which consent shall not be unreasonably withheld, conditioned or delayed. In the event that any unauthorized storage shall occur then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to the Tenant, which cost shall be immediately payable upon demand by Landlord.  Landlord shall provide sufficient

parking spaces at the Project for use by Tenant's employees and there shall be no charge for visitor or employee parking.

28.02   Maintenance.   Except as otherwise provided herein, Landlord shall operate and maintain the Common Area, keep the Common Area in good order and repair (including easily visible striping of the parking areas) and free of snow, ice and rubbish. Landlord shall keep the Common Area well illuminated at all times.

28.03   Common Areas – Rules and Regulations.   This project is currently an approved Condominium project. Landlord or such other person(s) as Landlord may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to adopt, modify, amend and enforce reasonable rules and regulations (**"Rules and Regulations"**) for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees, subject to Tenant's reasonable consent. The Tenant agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Notwithstanding the foregoing, the Rules and Regulations shall provide that Tenant's Unit may be used for any lawful purpose permitted under applicable law and neither Landlord nor its appointee will have any right to restrict or limit any lawful use of Tenant's Unit.

28.04   Pro Rata Share.   The **"Floor Area"** of a tenant in the Project shall be equal to the square footage of the Unit. A tenant's pro rata share of the expenses shall be determined as follows: a fraction the numerator of which shall be the Floor Area and the denominator of which shall be the total gross leasable floor area of the Project (presently estimated to be 66,000 square feet) (**"Pro Rata Share"**). Tenant's Floor Area is presently estimated to be 42,400 square feet, therefore Tenant's Pro Rata Share is 0.64.2% (**"Tenant's Pro Rata Share"**). In the event Tenant's Floor Area shall be increased or decreased, Tenant's Pro Rata Share shall be adjusted accordingly to reflect such increase or decrease in the Floor Area.

28.05   Common Areas – Changes.   Landlord shall have the right to, subject to the approval of Tenant, from time to time:

(i)   make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of the windows, stairways, air shafts, elevators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways, utility raceways and subterranean level not being leased to Tenant specifically;

(ii)   temporarily close any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available and such closure does not affect Tenant's operations or violate any applicable laws;

(iii)   designate other land outside the boundaries of the Project to be a part of the Common Areas;

(iv)   add additional buildings and improvements to the Common Areas;

      (v)    use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof,

      (vi)    lease, from time to time, the Second Floor Units, at market rates and upon other terms and conditions, and

      (vii)    do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Landlord may, in the reasonable exercise of sound business judgment, deem to be appropriate.

Notwithstanding the foregoing, Landlord shall not have the right to do any of the actions listed in subsections (i) through (vii) above if any of the above listed actions shall be deemed by Tenant to unreasonably interfere with Tenant's daily operations or violate any applicable laws.

28.06   Indemnification.   Landlord shall defend and save Tenant harmless and indemnified from all bodily and personal injury, loss, claims or damage to any person or property on or about the Common Areas (unless occasioned by the act or negligence of Tenant, its employees, agents, licensees or contractors, or by a default in the proper performance of Tenant's obligations under this Lease) and from and against all bodily or personal injury, loss, claims, or damage to any person which is occasioned by any act or negligence of Landlord, its employees or agents, or by a default in the proper performance of Landlord's obligations under this Lease."

## 13. ADDITIONAL AMENDMENTS TO THE EXISTING LEASE.

    (A)   Section 3.05 and Section 8.02 of the Existing Lease are hereby modified to add the following sentence at the end of the Section:

"Notwithstanding the foregoing, nothing in this Section shall be construed to make Tenant liable for any costs, expenses, obligations and charges whatsoever for any portion of the Project that is not located within the Premises, unless such obligation is expressly set forth in this Lease."

    (B)   Section 25.01 of the Existing Lease is amended to remove the words "medical office" from the third sentence after the word "remaining".

14. FULL FORCE AND EFFECT.   Except as amended hereby in this Amendment, all other terms and provisions of the Lease remains unmodified and in full force and effect and the parties hereto ratify and confirm the terms and provisions thereof.

15. COUNTERPARTS.   This Amendment may be executed in counterparts, each of which shall be deemed an original and shall be deemed duly executed upon the signing of the counterparts by the parties hereto. The parties agree that pdf or facsimile signatures hereto shall have the same force and effect as original signatures.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Amendment on the date(s) set forth below, as of the day and year first above written.

LANDLORD:
CENTERCOURT PARTNERS, LLC

By: _____
Roger Meyer, Managing Member

By: _____
Joseph Miller, CEO
CITY LIGHTS FINANCIAL EXPRESS, INC.

TENANT:
AH HEALTHCARE REALTY, LLC

By: _____
Devin Ehrlich, Vice President

ACKNOWLEDGED AND AGREED TO BY:

MARINER HEALTH CARE, INC., as Guarantor

By: _____
Devin Ehrlich, EVP





# EXHIBIT  B.8



**_VIA: EMAIL_**

Mr. Roger Meyer
Mr. Joseph Miller
Center Court Partners, LLC

c/o Mr. Bob Morey
Jones Lang LaSalle
2049 Century Park East, Suite 2750
Los Angeles, CA 90067

Dear Mr. Meyer and Mr. Miller:

     Outlined below is only our letter of proposal. It is not intended as, nor should it be construed to be a commitment. Rather, this letter should be viewed as an expression of our interest and to be used as a basis for continued discussion.

| | |
|---|---|
| **PROPOSED BORROWER:** | Centercourt Partners, LLC<br>Mariner Health Care, Inc. (if not a Guarantor) |
| **FACILITY AMOUNT:** | $12,000,000.00 (Twelve Million and No/100 Dollars). |
| **PURPOSE:** | Refinance with cash out the subject property known as "Canwood Plaza Medical Office Building" located at 29501 Canwood Street, Agoura Hills, CA 91301. Cash out from subject property will be utilized to cover the first 12 months interest payments (approx. $665,000) and to assist the TI (approx. $2,335,000) for the build-out of a 155-bed skilled nursing home facility. |
| **MATURITY:** | 3 years |
| **RATE/FEES:** | Interest Rate – Preferred Bank floating Prime Rate plus 1.5%; with the floor rate of 6.5%. Preferred Bank's Prime Rate is currently at 4.00%. |

| | |
|---|---|
| Loan Fee – | 1% of the Facility Amount. |
| Processing Fee- | $3,000 |
| Broker Fee - | To be paid by the Borrowers |
| Other Loan Cost - | To be paid by the Borrowers |

Centercourt Partners, LLC
March 10, 2011
Page 2 of 3

| | |
|---|---|
| **COLLATERAL:** | 1) First Deed of Trust and Assignment of Rents on the subject property located at 29501 Canwood Street, Agoura Hills, CA 91301; 2) UCC-1 blanket filing (1st position) on the subject property's fixtures, furniture, equipment, etc. |
| **GUARANTORS:** | Roger Meyers, Joseph Miller and Mariner Health Care, Inc. (if not a Borrower) |
| **REPAYMENT SCEHDULE:** | Interest only payable monthly for the first 12 months during the permit obtaining and TI period; principal plus interest due monthly, starting the 13th month and thereafter, based on a 25-year amortization schedule with unpaid principal and interest due at maturity. |

**PRE-FUNDING /
SUBJECT CONDITIONS:**

A.) Satisfactory review and approval of appraisal and appraisal review with cost to be paid by the Borrower. A Loan to Value, defined as the proposed Facility (Loan) Amount divided by the appraised stabilized value of the Property, shall be at no more than 57%; a Loan to Value, defined as the proposed Facility (Loan) Amount released to payoff the existing construction loan plus interest reserve (totaling approx. $9,670,000) divided by the appraised As-Is value of the Property, shall be no more than 65%.

B.) Bank's receipt, review, and approval of a clean Environmental report on the subject property reflecting no adverse environmental concerns.

C.) Bank's receipt and approval of the TI budget (hard cost, soft cost and FFE) prior to disbursing loan proceeds for the TI.

D.) Loan Disbursement for the TI shall be controlled by an outside Fund Controlled Company designated by the Bank with cost to be paid by the Borrower.

E.) Bank's receipt, review, and approval of current financial statements and historical latest three-year tax returns on Borrowers and Guarantors.

F.) Bank's receipt, review and approval of information regarding contingent liabilities and global cash flow on Guarantors.

G.) Acceptable credit checks on the Borrower and the Guarantor.

H.) Loan approval by Bank's Director Loan Committee.

I.) Subordination, NonDisturbance Attornment Agreement ("SNDA") and Estoppel Agreement from "Tenant" of subject property.

Centercourt Partners, LLC
March 10, 2011
Page 3 of 3

It is our desire to work with you in structuring a mutually acceptable borrowing arrangement. This expression of interest is provided to you solely for the purpose described herein and may not be disclosed to, or relied upon by, any other party without the prior written consent of Preferred Bank.

In connection with this proposal, you agree to pay an up-front deposit to the Bank including processing fee of $3,000, appraisal fee (to be provided by the Appraiser) and appraisal review fee ($350). In the event the Bank approves the loan and the credit is consummated, the processing fee will be incorporated into the closing costs of the loan. Should the Bank not approve the loan request, the processing fee is refundable after application against Bank's expenses and costs incurred in connection with the negotiation and process of this loan request.

This letter represents an expression of interest on our part. It does not constitute a commitment to lend money nor is it a legally binding agreement. Any loan facility would be subject to our due diligence including but not limited to the Bank's Director Loan Committee approval and execution of all necessary documentation.

Kindly indicate your agreement to work toward the structuring of a mutually acceptable arrangement by signing the enclosed copy and returning it to Preferred Bank on or before the expiration of this letter of proposal on **March 21, 2011** along with your deposit (amount to be advised before 3/18/10).

Sincerely,

_____                    _____
Erika Chi                                       Isabella Li
Senior Vice President                           Commercial Banking Officer

---

The undersigned acknowledge that the terms and conditions described in this letter are a proposal, not a commitment, and are subject to further evaluation and change, based upon the underwriting and approval of the completed loan package.

Executed this 13 day of March, 2011.

By: _____                By: _____

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

2001 Wilshire Blvd. Suite 205
Santa Monica, CA 90403

A true and correct copy of the foregoing document described as **Original Disclosure Statement** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 20, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Katherine A. Bunker, kate.bunker@usdoj.gov
Ashleigh A Danker, adanker@kayescholer.com
Melissa J Fassett, mjf@pplaw.com
United States Trustee (SV)  ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **June 20, 2011,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Honorable Maureen A. Tighe**
U.S. Bankruptcy Court
21041 Burbank Blvd., Suite 325
Woodland Hills, CA 91367

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 19, 2011,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 6-20-11 | Martin D. Gross | /s/ Martin D. Gross |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                      **F 9013-3.1.PROOF.SERVICE**